## ANDERSON v. MISSOURI STATE LIFE INS. CO.

No. 6529.

Circuit Court of Appeals, Sixth Circuit.

March 12, 1934.

Robert S. Marx, of Cincinnati, Ohio (Nichols, Morrill, Wood, Marx & Ginter, of Cincinnati, Ohio, on the brief), for appellant.

Wm. Marshall Bullitt, of Louisville, Ky. (Allen May, of St. Louis, Mo., and Leo T. Wolford, of Louisville, Ky., on the brief), for appellee.

Before HICKS, HICKENLOOPER, and SIMONS, Circuit Judges.

SIMONS, Circuit Judge.

The proceeding below was by bill in equity to compel the appellant receiver to pay the Missouri State Life Insurance Company the 67 per cent. dividend accorded to other creditors upon two certificates of deposit totaling $500,000, issued by the National Bank of Kentucky as of August 21, 1930. The receiver had refused to pay the dividend on the ground inter alia that the Missouri State Life was not a bona fide holder of the certificates, and on the further ground that it had agreed to apply the proceeds of the certificates upon the existing debt to the bank of another company. After an extended statement by counsel for

the receiver outlining his defenses and incorporating the allegations of his answer, the court without receiving evidence gave judgment for the plaintiff in the full amount claimed, together with interest, and directed the issue of a mandatory injunction for the payment of dividends thereon.

The history of the certificates of deposit, and the relationship of the parties, as claimed by the receiver, follows: Rogers Caldwell was a broker and promoter operating on an extensive scale, and controlling through stock ownership, interlocking boards of directors, and dummies, a large number of important banking and insurance corporations. Among the companies dominated and controlled by Caldwell were Caldwell & Co., a brokerage corporation with offices in Nashville, Tenn., the Associated Life Company, the Bank of Tennessee, said to be a bank in name only, without a banking house, vaults, or fixtures, and with no general banking business, the Inter-Southern Life Insurance Company, and other banks and insurance companies, including the Missouri State Life Insurance Company. For a number of years he had been shifting the funds of all these banks and companies among each other to avoid unfavorable reports of bank examiners and insurance commissioners. Through Caldwell & Co. he was selling the Missouri State Life a large share of the securities purchased by it, many of them doubtful in character and not legal investments under the laws of Missouri, where the company was chartered, and including many mortgages already in default.

It would extend this opinion unduly to recite the whole story of his financial juggling and the irregular, if not illegal, operations of the several corporations unfolded in the opening statement of counsel. It is sufficient at this point to say that it is a tale of frenzied finance at its boldest and most reckless worst. Briefly, however, this was the general character of Caldwell's activities in connection with the several named corporations when on August 21, 1930, the Associated Life Company, through its president, Arnet, and Caldwell, negotiated a loan of $500,000 from the National Bank of Kentucky, giving its note for that amount secured by certain collateral. At the same time it purchased from the bank two certificates of deposit, each in the sum of $250,000, issued to Caldwell & Co., and as a condition precedent to the issuance of the certicates it delivered to the bank a letter stating that it had purchased the certificates from the proceeds of the loan in the name of Caldwell & Co., and incorporating this undertaking:

"We hereby agree and guarantee that the certificates of deposit will not be cashed only in the reduction of the above mentioned loan."

Shortly thereafter the two certificates of deposit were purchased from Caldwell & Co. by the Missouri State Life for the sum of $500,000 cash. Acting ostensibly at least for the Missouri State Life was its executive committee, to whom broad powers had been delegated. This committee consisted of Rogers Caldwell, G. C. Arnet, president of the Associated Life, James E. Caldwell, the father of Rogers Caldwell, and Hillman Taylor, president of the company. Caldwell & Co. had at one time owned 70 per cent. of the Missouri State Life capital stock, and at the time of this transaction owned 30 per cent. Through Rogers Caldwell it dominated the Missouri Life. Whether there were other directors than the members of the executive committee does not appear.

Shortly after its purchase of the certificates from Caldwell & Co., the Missouri State Life sent them to the Kentucky Bank with a request that they be exchanged for new certificates issued to itself. When the first certificate was received the bank did not immediately reissue it, but waited for some seven or eight days until it could confer with Rogers Caldwell, who was expected in Louisville. At a conference between Caldwell and officers of the bank, Caldwell was told that the reissuing of the certificates was not according to the agreement, which provided that they would not be cashed except in payment of the Associated Life note. Caldwell then agreed that the agreement made by the Associated Life would be binding upon the Missouri State Life, and that the Missouri State Life would not cash the new certificates except and unless the note was paid. It was only after Caldwell, presuming to act for the Missouri State Life, had made this agreement that the bank issued the new certificates, dating them back to August 21st, the date upon which the originals were issued.

The case thus briefly reviewed presents two phases, the first involving the written agreement between the bank and the Associated Life, and the second involving the oral agreement between the bank and Caldwell in respect to the issue of the new certificates, which are the securities here sued upon.

■ Upon the first phase the District Judge concluded that if there was any infirmity attaching to the original certificates of deposit by reason of the written agreement between the bank and the Associated Life, such infirmity was not within the knowledge of the

Missouri State Life; that even though Caldwell knew of it, he had acquired his information while acting for himself or for Caldwell & Co., and not for the purchasing company; that since it was against his interests to have the latter know of the agreement, but rather to his interest to conceal it, it could not, under the familiar rule of agency, be presumed that he would communicate his knowledge to his principal, and that the Missouri State Life was not therefore chargeable with such knowledge. American National Bank v. Miller, 229 U. S. 517, 33 S. Ct. 883, 57 L. Ed. 1310; Ohio Millers' Mutual Insurance Company v. Artesia State Bank (C. C. A.) 39 F.(2d) 400. Since Arnet also knew of the agreement, and his interest was adverse, the same rule applied as to his knowledge. It was said of James Caldwell that he must have known of the infirmity in the certificates. This statement the court did not consider as tantamount to a charge of knowledge by James Caldwell, but even if so, he was in the same boat with his son and Arnet. Of Taylor, the fourth member of the executive committee, it was said that if he had exercised his proper duty in investigating the big purchase of his company, he would have known about the agreement, but the court concluded Taylor knew nothing, a conclusion based partly, perhaps, on the statement that Taylor, in a deposition filed in the case but not in the record, had denied knowledge. Taylor's adverse interest does not appear. The court refused to consider that any infirmity in the certificates was known to the Missouri State Life. On the second phase of the case the court concluded that in substituting the new certificates for the old, the defendant waived the collateral agreement entered into with respect to the original certificates; that such waiver was not affected by the subsequent understanding which the bank officials had with Rogers Caldwell at the time of the substitution; that Rogers Caldwell in the making of such oral agreement had no authority to act for the Missouri State Life; and that in any event the agreement could not be proved in defiance of the parol evidence rule.

■ With respect to the first phase of the case, we find no error in the court's statement of the law, nor with its application to the facts as they were assumed to be. A much broader and more sinister situation, however, than was assumed to exist seems to us well within the fair intendment of the allegations in the pleading and the statement of counsel, and it is axiomatic that in order to sustain a judgment upon a mere statement, admissions must clearly preclude recovery or defense, and

broad and liberal interpretation must be made without too precise limitation of the meaning of specific words and phrases.

■■ Taking the defendant's case, developed below as a whole, there seems to us to be clearly an offer of proof that Rogers Caldwell, through the instrumentality of the various corporations dominated and controlled by him, was engaged in perpetrating a fraud upon the bank, and that the Missouri State Life was a willing instrument in its perpetration. In support, counsel offered to show numerous questionable transactions by the Missouri State Life during a number of years preceding the one here involved, and others contemporaneous therewith, that the Missouri Life had permitted its funds to be juggled and its checks issued on banks in excess of deposits. Its office had been moved from St. Louis to Nashville, its investments made through Caldwell & Co., its meetings held in Caldwell's office. Caldwell's original investment in Missouri State Life's stock had been purchased with funds borrowed from it. He had named its directors, some of them never attending meetings or in any way interfering with his control. Over a million dollars was deposited in Caldwell's Bank of Tennessee. At various times the Missouri State Life's deposits in the Bank of Tennessee exceeded its total resources, and it bought questionable bonds from Caldwell & Co. for cash to permit Caldwell & Co. to raise the cash resources of its Tennessee bank. To deceive insurance commissioners and bank examiners the Missouri Life would draw checks on its Tennessee Bank account and deposit them with banks around the country, redepositing the money after examination and before the checks were cleared. The insurance commissioners in May, 1930, but a few months before the transaction here involved, had severely criticized the purchase of securities from Caldwell & Co. Notwithstanding this criticism, the Missouri State Life substantially financed the so-called "Inter-Southern" deal, whereby Caldwell sold 116,000 shares of Missouri stock to the Inter-Southern Life Insurance Company, a Caldwell corporation, taking in exchange $4,000,000 of securities and mortgages, many of them in default, and selling half of them on the same day to Missouri State Life for cash realized by the latter on the sale of government bonds, and deposited in Caldwell's Fourth & First Bank in Nashville. Among the securities thus purchased by the Missouri State Life were $300,000 worth of Florida bonds taken at par when the market price was between $50 and $60. Though this transaction was ordered rescinded by the insurance commission-

er, it was never done. In June, 1930, the Missouri Life made a large deposit in the National Bank of Kentucky by means of a check on the Tennessee Bank, where it had a balance of nearly a million dollars, though the actual cash and credit resources of the bank were less than one-third thereof. To permit the Tennessee Bank to honor its check, the Missouri State Life had transferred by telegraph to Nashville some of its credits in the First National Bank of St. Louis, and from the National Bank of Kentucky part of the deposit account created by the very check on the Tennessee Bank which it now sought to protect. But it is unnecessary to follow this maze of financial legerdemain further.

Whatever may have been the actual knowledge of the members of its executive committee, or its president, or of any other officers or directors, of the particular transaction here involved, it cannot be denied that the evidence offered upon this record, unchallenged or surviving destruction by adverse proofs, fully demonstrates that the corporate will of Missouri State Life was exercised only by Caldwell, or at his bidding. If directors or committees abdicate, surrender their powers, and subordinate their judgments and their will to one dominating individual, hermetically seal their minds to the obvious, permit their corporation to be used as an instrumentality of deception, unlawfulness and fraud, pursued over a period of years, can it be said that the corporation may escape liability because there is failure of proof of specific knowledge of one irregular transaction, when many have been continuously engaged in? We think this cannot be so. The loan from the bank by Associated Life, the agreement with respect to its payment, the immediate negotiation of the securities with the Missouri Life, the latter's immediate endeavor to avoid their infirmities and to put itself into the position of a bona fide holder, were all steps within the fair meaning of the opening statement of counsel in a unitary plan to avoid the burden put upon the certificates when issued. As was said by the United States Supreme Court of steps taken in a different situation, "They have the unity of a common plan, each stage of the transaction drawing color and significance from the quality of the other." Shapiro v. Wilgus, 287 U. S. 348, 353, 53 S. Ct. 142, 77 L. Ed. 355, 85 A. L. R. 128. It is unimportant here that the plan may also have included the defrauding of the Missouri Life. It is sufficient that one of its purposes was the defrauding of the bank, and that the Missouri Life, if not with actual knowledge of the exact nature of the transaction, still with such knowledge as must open the eyes of even the least alert of its stockholders or directors, lent itself to that plan.

 Nor do we see here any escape from the "sole actor" doctrine even in the limited application that was made of it by this court in the third phase of Kean v. National City Bank, 294 F. 214, and by the Supreme Court in Curtis, Collins & Holbrook Co. v. United States, 262 U. S. 215, 43 S. Ct. 570, 67 L. Ed. 956. When members of a board or committee representing a corporation surrender their powers to an individual, either within or without such board or committee, who completely dominates, and through whom only the corporate powers are exercised, such board or committee is the sole actor, with but a single will and purpose, or else the dominant individual is the sole actor, and the others are to be ignored as if they did not in fact, as they do not functionally, exist. However considered, the principle is the same. So applying the sole actor doctrine, we cannot distinguish this case either from the third phase of the Kean Case, supra, or from the holdings of this court in National City Bank v. Carter, 14 F. (2d) 940, and National City Bank v. Carter, 31 F. (2d) 25. Moreover, the question of exclusive control is one of fact upon all the evidence, and the amount of stock owned by Caldwell is, on that issue, not at all conclusive.

 In relation to the second phase of the case, we think the court below was in error in holding that the issue of the substituted certificates by the bank was a waiver of any infirmity that attached to the original certificates. The burden of proof to establish waiver is upon the one who asserts it, and the intention to waive must be clear. Reynolds v. Detroit Fidelity & Surety Co., 19 F. (2d) 110 (C. C. A. 6); National City Bank v. National Security Company, 58 F. (2d) 7 (C. C. A. 6). Moreover, a waiver is not to be lightly inferred in the face of a clearly expressed intention to insist upon the right alleged to have been waived, Columbia Axle Company v. American Automobile Insurance Co., 63 F. (2d) 206 (C. C. A. 6), and must be based upon a consideration, Reynolds v. Detroit Fidelity & Surety Co., supra. Aside from this, however, we have here an offer of proof of a specific agreement made between the Missouri State Life and the Bank with respect to the use or application of the proceeds of the certificates. True it is that Caldwell's authority to make this agreement on behalf of the Missouri State Life is challenged. The most that can be said, however, for the plaintiff in respect to Caldwell's authority is that

the opening statement presents an issue of fact for the judge to decide in respect to it. It may well appear upon all the evidence that Caldwell's permitted domination of the corporation, the earlier transactions between the parties, including the plaintiff's opening of an enormous deposit account with the bank upon the latter's mere solicitation thereof from Caldwell, and the acquiescence of all of its officers in whatever Caldwell did in its behalf, leave little room for doubt that he possessed sufficient original authority to make the agreement. But this the court may not be called upon to decide. Ostensibly at least Caldwell was acting for the Missouri State Life when he entered into the oral agreement. Without his undertaking on its behalf the substituted certificates would not have been issued. These certificates were accepted and retained by the corporation, they formed the basis of the claim filed with the receiver, and it is upon them that the Missouri State Life, with knowledge of their claimed infirmity, now plants its suit. This course of conduct by the plaintiff presents circumstances whereby, if not ratification, at least an estoppel to deny authority may well be established. The Missouri State Life cannot assert its rights under the certificates obtained by virtue of its agent's promise and at the same time repudiate his authority, and this may well be decisive of the whole controversy. Curtis, Collins & Holbrook Co. v. United States, supra. There can be no doubt that in this second transaction with the bank Caldwell was acting for and on behalf of the Insurance Company, even though he had some interest of his own to serve. The result sought and achieved was the issuing of the substituted certificates.

Nor was proof of the second agreement inadmissible under the parol evidence rule. The suit was brought by the Missouri State Life, and not by the receiver. Neither the answer nor the statement denies or contradicts the terms of the certificates sued upon. The defense is merely that such certificates do not constitute the whole agreement, and the receiver should have been permitted to show what the arrangement was. That contracts may rest partly in writing and partly in parol is too well settled to require exposition. It is only where the writing embodies the whole agreement that the parol evidence rule applies.

Inasmuch as the case must be remanded for trial, with appropriate findings of fact and conclusions of law, based upon the

evidence, it is appropriate for us to say that in our opinion interest should not have been allowed upon the judgment beyond the date of the receivership. Gamble v. Wimberly, 44 F.(2d) 329 (C. C. A. 4); White v. Knox, 111 U. S. 784, 4 S. Ct. 686, 28 L. Ed. 603; Butler v. Western German Bank (C. C. A.) 159 F. 116; Richardson v. Louisville Banking Co. (C. C. A.) 94 F. 442. So far as this record shows, the funds available for the payment of depositors and other creditors will not be sufficient to pay all of the claims against the bank in full. The fund ought not to be depleted by the payment of interest beyond the date of the closing of the bank, even if the receiver's judgment in resisting the claim proves to be unsound. Whatever may be the decree below, it will of course take into consideration the amount realized by the receiver on the sale of collateral pledged by the Associated Life.

Reversed and remanded for trial.[1]

[1] The late Judge HICKENLOOPER concurred in the result, though he did not see the opinion as announced.