**BUTLER v. HARRIMAN NAT. BANK & TRUST CO. OF CITY OF NEW YORK et al.**

No. 452.

Circuit Court of Appeals, Second Circuit.

July 23, 1934.

O'Brien, Boardman, Conboy, Memhard & Early, of New York City (John Vance Hewitt and Milton I. Newman, both of New York City, of counsel), for appellants.

Chrystie & Chrystie, of New York City (T. Ludlow Chrystie, of New York City, of counsel) for appellee.

Before SWAN and AUGUSTUS N. HAND, Circuit Judges, and CAMPBELL, District Judge.

SWAN, Circuit Judge.

By this suit, removed from the Supreme Court of Suffolk county, N. Y., the plaintiff sought recovery of certain securities which he alleged he had delivered to the Harriman National Bank & Trust Company of the City of New York for safe-keeping for his account. Henry E. Cooper, appointed as conservator of the bank pursuant to the Bank Conservation Act of March 9, 1933 (Stat. 73d Cong., 1st Sess., p. 2 [12 USCA §§ 201–211]), was joined as a defendant, and by subsequent amendment Frederick E. Goess, as receiver of the bank, was also joined. The defendants admitted receipt by the bank of the securities in controversy, but alleged that the plaintiff, Dr. Butler, had agreed with J. W. Harriman that the latter might use them and that Harriman had hypothecated them with the bank to secure an indebtedness of Mrs. Harriman to it. After a lengthy hearing the trial judge made a finding that Dr. Butler never gave the bank, by prior consent or subsequent ratification or otherwise, any authority to deal with his securities in any manner other than to make sales and purchases and to hold the securities so received and purchased in safe-keeping for his account and subject to his instructions. If this finding is sustainable, the decree for the plaintiff is concededly correct; but the defendants contend that the record will not support it.

In December, 1931, Dr. Butler was notified by the firm of stockbrokers with whom he had long done business that his account was "undermargined" to the extent of $15,000, and that certain of his bonds might in the near future become unacceptable as collateral. He consulted his friend, Mr. J. W. Harriman, then president of the defendant bank, for advice as to the wisdom of selling some of the securities. Mr. Harriman advised him to close his account with the brokers and bring it to the bank. The bank loaned Dr. Butler $126,000 on his unsecured note dated January 8, 1932, and out of this loan paid to the brokers, on January 11th, Dr. Butler's indebtedness to them of $125,526.50, receiving in exchange his securities which then had a market value of $217,320. The following day the trust department of the bank sent Dr. Butler a list of the securities it had received "for account of—Sundry Account—Nicholas M. Butler." Two days later the securities were transferred from the trust department to the loan department of the bank without notice to Dr. Butler. This was done upon the order of Mr. Harriman who on January 14th pledged them as security for a new loan by the bank to his wife for $150,000. Mrs. Harriman was also indebted to the bank in some $83,000 upon a prior loan, and for this loan too the bank claims the right to hold Dr. Butler's securities as collateral.

It is admitted that Dr. Butler gave no written authority for such use of his securities, but it is argued that this understanding with Mr. Harriman is evidenced by the latter's letter of January 8, 1932, which is headed "strictly confidential" and reads as follows:

"Dear Dr. Butler:

"Relative to your note of $126,000 dated January 8, 1932, for six months, I hereby guarantee said loan as to the principal payment.

"I further acknowledge receipt of certain securities, as indicated in the attached schedule, which I have borrowed temporarily. The interest and dividends received from these securities will, of course, be yours, and will be credited as received to your account with us and notices sent you.

"I sincerely appreciate your action in the above matter.

"Yours very sincerely,

"J. W. Harriman."

Dr. Butler testified that he received this letter on January 11th or 12th, that in his prior conversations with Mr. Harriman there had been no mention of borrowing his securities, and that upon receipt of this letter he

immediately called on Mr. Harriman and protested vehemently against any borrowing of them, stating that he relied upon them to take care of his loan from the bank and under no circumstances could he part with them. Mr. Harriman, he says, treated the matter lightly, told him not to worry about it, and said, "Give this no concern, trust the Bank absolutely, and they will take care of you and you need not worry; they are here whenever you want them, and the income will be paid you." With this assurance Dr. Butler was satisfied. The income as collected was credited to his checking account in the bank. During the months of January, February, and March, 1932, he gave the bank instructions to sell certain of the securities and buy others. These orders were executed with corresponding credits and debits to his checking account, and the bank sent him notifications in customary form of sales or purchases "for his account." Not until July 27, 1932, did he learn from Mr. Austin, vice president of the bank, that Mr. Harriman had borrowed the securities, and not until the bank's letter of August 11th did he know that they had been pledged for a loan by the bank to Mrs. Harriman. Dr. Butler says that thereafter he constantly protested to Austin and urged him to take action to obtain the restoration of his securities, although his first written protest was his letter of December 22, 1932, after he had consulted his attorneys. The District Court's oral opinion states that he gave full credence to Dr. Butler's testimony.

Against the conclusion that Dr. Butler did not give Mr. Harriman prior authority to use his securities nor ratify the unauthorized pledge of them, the appellants urge several considerations:

(1) Although the record discloses that Dr. Butler habitually confirmed by letter his conversations with Austin and with Harriman, he wrote nothing to negative the statement about borrowing contained in Harriman's letter of January 8, 1932, but was content to rest upon his oral protest.

(2) On June 6, 1932, Austin notified Dr. Butler that $4,000 of New York City 6's (purchased with proceeds of a sale of some of the original securities) "were held in the Loan department, while the balance of $50,000 are held free in the Trust department for your account." The $50,000 had been purchased with new money supplied by Dr. Butler. Thus he was put on notice that the securities substituted by purchase for those originally brought over from the stockbrokers were held by the bank in its "Loan department." He explains this division of his securities by saying that the original securities and substitutes therefor were with the bank on "my loan." This is inconsistent with the form of the unsecured note he had given the bank, but it must be remembered that Dr. Butler is not a lawyer. He testified that he understood that his securities were pledged to the bank as they had been to the brokers.

(3) On July 27, 1932, Dr. Butler wrote Austin requesting him to arrange that "my securities which have been loaned to our friend should be released." If this is a reference to an unauthorized loan by the bank of Dr. Butler's securities to Mr. Harriman, the tone of the letter is surprisingly calm.

(4) On August 18, 1932, after an interview with Mr. Harriman, Dr. Butler wrote: "It was a great pleasure to have a talk with you yesterday, and I was greatly cheered in consequence. I shall drop in again before long." What was said at the conference is not in evidence, but the friendly tone of the letter seems quite remarkable when one considers that the writer is addressing the man whom he charges with hypothecating without authority more than $200,000 of the writer's securities.

(5) In connection with each renewal note to the bank, Dr. Butler insisted upon obtaining a new "guaranty" by Harriman, each of which referred by date to the original Harriman letter of January 8, 1932. When forwarding the first renewal note dated May 2, Dr. Butler wrote to Austin on April 18, 1932: "You, I take it, wish me to bring in Mr. Harriman's letter, as the arrangement now making will require a letter with date and amount changed." If Harriman had no authority to borrow the securities, there was no consideration to support his "guaranty." Dr. Butler testified that he understood Harriman to have given it merely out of the goodness of his heart.

The foregoing matters of record militate with some force against the finding of the trial court. On the other hand, it does not seem probable that Dr. Butler would consent to let Harriman pledge his securities for any purpose whatever and to any amount. He was in no such straits as to impel him to enter into such an arrangement. On January 1, 1932, he had enough cash in banks, without selling any of his securities, to reduce his brokers' loan to about $50,000, against which would stand his securities of a market value of more than $200,000. There is every reason to believe Dr. Butler's testimony that until he received Mr. Harriman's letter of January 8, 1932, he did not expect a guaran-

ty from Harriman and the idea of loaning him the securities had never been suggested. The fact that Dr. Butler never agreed in writing to any such use of his securities as Harriman made of them is not without significance. Harriman, though reputed rich, was really on the verge of financial failure, and very probably evolved the idea of writing his letter of January 8th, containing the so-called guaranty, in order that he might establish a basis for adding that he had "temporarily borrowed" Dr. Butler's securities. The legal significance of the guaranty is perhaps somewhat doubtful, but certainly it was not intended that Harriman should bear the ultimate burden of paying the bank's loan to Dr. Butler. The latter testified: "Mr. Harriman told me the note could be renewed as often and as long as I pleased, and I could pay it by installments, and he advised that I let it go as a note until prices improved, when I could pay it from the profit of these securities." This arrangement Dr. Butler probably thought was embodied in the words of the guaranty; that is, if the bank should insist on payment before Dr. Butler was ready to sell his securities, then Harriman was to pay the principal of the loan, and Dr. Butler's obligation to him would stand upon similar terms. With this meaning ascribed to the guaranty, it was natural for Dr. Butler to ask for a re-execution of it each time the bank loan was renewed; borrowing of the securities by Harriman, to which Dr. Butler had refused his consent, might well be unrelated in his mind to continuing this arrangement. In his interview with Harriman immediately following receipt of the letter of January 8th, Dr. Butler told him that he was depending on the securities "to take care of my loan from the Harriman Bank, and that under no circumstances could I part with them," and he was told to trust the bank completely and that the securities would be there whenever he should want them. Perhaps he was reassured too easily by Harriman's honeyed words, but we cannot doubt that he was given the impression that his securities could be used only to protect the bank on its loan or Harriman on his guaranty. It is true that by Austin's letter of June 6th he was advised that substitutes for his original securities were held in the "Loan department." But his explanation that this was because of his own loan is not an incredible view for a layman to entertain. It is true also that it may seem somewhat strange that a man so careful as Dr. Butler to put business matters in writing did not send a written repudiation of Harriman's suggestion that the securities had been temporarily borrowed by him. However, Harriman was a trusted friend, the interview with him had lulled Dr. Butler's fears, and such a letter may have seemed an unnecessary formality. Moreover, it must be remembered that the bank had taken the securities into its trust department for safe-keeping for his account, and the burden is on it of getting them out of that account and showing them lawfully pledged for Mrs. Harriman's debt. Accepting as true Dr. Butler's testimony, as did the trial judge, he gave Harriman no actual authority to pledge his securities, and he clothed him with no apparent authority in reliance on which the bank acted. The letter of January 8, 1932, was written to, and not by, Dr. Butler and even this letter had not been seen by any official other than Harriman when the pledge was made. Harriman's subordinates relied solely on his orders. On this record we cannot say that the finding of the trial judge to the effect that Dr. Butler gave no authority by prior consent to the hypothecation of his securities was erroneous.

■ Accepting the premise that the pledge was originally unauthorized, we can reverse the decree only if Dr. Butler ratified or acquiesced in the pledge after learning of it. Not until the end of July, 1932, did he learn of it. He testified that each week thereafter he made vigorous protests to Austin urging him to restore the securities to the safe-keeping account, and that Austin told him they ought not to have been pledged and assured him he would try to secure their release. No denial of this testimony came from Austin. There was no ratification or acquiescence by silence, since Dr. Butler was constantly protesting. Austin was an official to whom it was appropriate for Dr. Butler to complain even though Mr. Cooper was then president of the bank. While it is true that the letters referring to "the loan to our friend" and the letter of August 18th to Mr. Harriman are scarcely in the tone one would expect, we ought not to impute ratification because Dr. Butler preferred to use persuasion and tact (involving some consideration for Harriman) rather than denunciations and formal demands. He was pressing for the return of his securities in the way he thought most likely to succeed. Extension of the bank loan in November and the renewal of Harriman's guaranty are not conclusive of ratification in view of the constant protests to Austin and Dr. Butler's understanding of the guaranty as independent of any borrowing of his securities by Harriman. Indeed, renewal of the guaranty was a matter in which the bank had no interest

and quite independent of its own extension of the loan. None of the authorities relied upon by the appellants is close enough to the facts at bar to require discussion.

Accordingly, the District Judge's finding on the subject of ratification must likewise be sustained, and the decree must be affirmed.