## SATTERWHITE v. HARRIMAN NAT. BANK & TRUST CO. OF CITY OF NEW YORK et al.

District Court, S. D. New York.
June 4, 1935.

Gleason, McLanahan, Merritt & Ingraham, of New York City (Walter Gordon Merritt, Burgess Osterhout, and Robert T. Crane, Jr., all of New York City, of counsel), for plaintiff.

O'Brien, Boardman, Hewitt, Memhard & Early, of New York City (John V. Hewitt, Hobart L. Brinsmade, Edward F. Butler, and David Asch, all of New York City, of counsel), for defendants Harriman Nat. Bank & Trust Co. of New York, and Frederick V. Goess.

P. W. Williams, of New York City (E. McDuffie, of New York City, of counsel), for defendant Harriman.

Rushmore, Bisbee. & Stern, of New York City (George N. Hamlin, of New York City, of counsel), for defendant Austin.

WOOLSEY, District Judge.

My judgment herein is as follows:

A. I dismiss the bill of complaint as against the defendant Austin, without costs.

B. I give to the plaintiff as against the other defendants named an interlocutory decree which will carry costs and which will provide: (1) For the rescission of the loan agreement of April 26, 1932, made between him and the Harriman National Bank & Trust Company, hereinafter referred to as the Harriman Bank, and for the delivery to the plaintiff of the 10,000 shares of the stock of the Standard Oil Company of New Jersey, together with a reconveyance to the plaintiff of all other collateral owned by him and now in the receiver's hands, on condition that the plaintiff pays to the receiver at the time of such delivery and reconveyance to plaintiff of said collateral the sum of $300,000, together with any unpaid interest thereon, less such an amount as may be determined by a special master to have been the damages suffered by the plaintiff by reason of the fraud perpetrated on him as shown by the record herein; (2) that Thomas E. Dewey, Esq.,[1] of 120 Broadway, New York City, be appointed as special master, to determine the amount of said damages; and (3) that the estate in the hands of the receiver, the defendant Harriman Bank, and the defendant Harriman be held liable for such damages.

I. The essential facts in this case are rather simple.

The plaintiff first went into the Harriman Bank on or about April 21, 1932, and began negotiations with the defendant Harriman, whom he had known for some time, for securing a loan from the Harriman Bank in the sum of $300,000. His object was to reduce loans which he had with the National City Bank and on which he was being pressed. He offered to the Harriman Bank as collateral for the loan he sought 15,000 shares of the stock of the Standard Oil Company of New Jersey, then worth in the neighborhood of $300,000, together with a bill of sale for certain tapestries and other art objects owned by him and located in his apartment in New York City. These negotiations occurred between the plaintiff and the defendant Harriman as president of the Harriman Bank, and the loan was finally agreed on with the Harriman Bank through the defendant Harriman after negotiations covering several days.

On April 26, 1932, before the shares above mentioned were delivered to the Harriman Bank, the plaintiff gave a bill of sale for the art objects above referred to as additional collateral and signed a collateral note in which the nature of the collateral was left blank, and also an entirely blank letter of hypothecation.

Also on April 26, 1932, the 15,000 shares of stock of the Standard Oil Company of New Jersey, above referred to, were delivered by the National City Bank to the Harriman National Bank & Trust Company pursuant to letters of instruction from the plaintiff to both Banks directing that the said shares be so delivered on payment

---

[1] After the interlocutory decree herein provided for was signed and filed, Mr. Dewey was appointed assistant district attorney of New York county. He thereupon withdrew as special master, and Edward W. Bourne, Esq., was duly appointed as special master in his place by an amendment to the interlocutory decree.

to the National City Bank of the sum of $300,000. The Harriman Bank receipted for said shares on the letter sent by the National City Bank to the Harriman Bank with said shares, and the National City Bank received the $300,000.

At the time when the certificates for the 15,000 shares of the stock of the Standard Oil Company of New Jersey were delivered to the Harriman Bank they stood in the name of Dwyer & Co., the nominee for street purposes of the National City Bank, and were the property of the plaintiff. On May 9, 1932, the said shares were transferred by order of the defendant Harriman to the name of Farrington & Co., the nominee for street purposes of the Harriman Bank.

I find that Dr. Satterwhite intended that the 15,000 shares of stock of the Standard Oil Company of New Jersey which he had taken from under his loan with the National City Bank and had sent over to the Harriman Bank should be used as collateral for his $300,000 loan from the Harriman Bank, and that the bill of sale of his art objects was intended to act as extra collateral therefor in the event that the market value of the Standard Oil Company stock declined.

I think this is the only possible proper finding from the plaintiff's oral evidence, which I believe in its main outline, and which is not contradicted by any evidence from the defendant Harriman. This finding is in all respects confirmed by the letters of instruction sent by the plaintiff to both banks at the time the loan was consummated.

Ten thousand of the shares of the stock of the Standard Oil Company of New Jersey, delivered to the Harriman Bank as aforesaid after a peripatetic career under various loans to Harriman from the Harriman Bank, finally were found at rest as collateral for a loan by the Harriman Bank to the MHO Company, which was owned entirely by the defendant Harriman, and are now in the receiver's hands.

Five thousand of the said 15,000 shares were found in the hands of a brokerage house, E. B. Smith & Co., as collateral to an account of the defendant Harriman. This brokerage house is admittedly a bona fide holder of said shares, and in order to liquidate its account with the defendant Harriman it had to sell 3,840 shares of the said 5,000 shares.

This sale was made pursuant to certain without prejudice letters passing between counsel for the plaintiff and counsel for E. B. Smith & Co., the brokers, with the consent of the defendant Harriman and the Harriman Bank, to which Harriman had assigned his equity in his account with the brokers.

Eleven hundred and sixty of said 5,000 shares and the sum of $38.40 were returned by E. B. Smith & Co. to the plaintiff after liquidation of Harriman's account under the without prejudice letters mentioned. Therefore, those shares are not dealt with in the decree.

For some time before the date in question the Harriman Bank had not been in a very strong condition and its loans had been criticised on several examinations by the federal bank examiners. Consequently, the arrival of the plaintiff on the scene with such good collateral as he was offering was, so far as the defendant Harriman was concerned, comparable to the sighting by a master of a distressed vessel of a succouring sail, and when his negotiations with the plaintiff began I find that his fraudulent intention was formed to get hold of the plaintiff's stock for his own purposes while leaving the impression with the plaintiff that, according to the agreement, they were being used as collateral to the plaintiff's loan.

I do not find that the defendant Austin consciously participated in this fraud, or did any act intentionally to mislead the plaintiff. He was not in a conspiracy with Harriman for such purpose, and is not shown to be guilty of any act for which he might be held liable here.

This in brief is an outline of the situation which I think is sufficient for my purpose, and I find, therefore, that by the fraud of Harriman, the stock of the Standard Oil Company of New Jersey was not included in the plaintiff's note as collateral for the loan, but was taken by Harriman pursuant to the intention which he had formed during the negotiations and before the loan was consummated to use the 15,000 shares of the stock of the Standard Oil Company of New Jersey for his own purposes without the plaintiff's consent.

II. When the 15,000 shares of stock of the Standard Oil Company of New Jersey, owned by the plaintiff, were sent to and received by the Harriman Bank on April 26,

1932, that bank became bailee of those shares, and had only the right to use them in accordance with the purpose for which the plaintiff had parted with them; namely, as collateral under his loan.

The Harriman Bank, therefore, at once on receiving those shares came to occupy a fiduciary capacity towards the plaintiff, on the principle that when the property of one man is delivered to another and accepted by the latter, the property can only be used by him in the manner in which it was agreed and intended by its owner that it should be used, and if it is used otherwise the party who received it and so used it, being a fiduciary, must explain how it came to be so used. Cf. Harvey Brokerage Co. v. Ambassador Hotel Corporation (In re Butler) (D.C.) 57 F.(2d) 727.

■ The receiver now claims that the Harriman Bank is entitled to hold the 10,000 shares of stock of the Standard Oil Company of New Jersey which is now in his possession as an innocent pledgee for value. Such a defense is an affirmative defense, confession and avoidance, and the burden is on the receiver to maintain it. Curtis, Collins & Holbrook Co. v. United States, 262 U.S. 215, 225, 43 S.Ct. 570, 67 L.Ed. 956; Wright-Blodgett Co. v. United States, 236 U.S. 397, 35 S.Ct. 339, 59 L.Ed. 637; Boone v. Chiles, 10 Pet. 177, 211, 212, 9 L.Ed. 388; Butler v. Harriman Bank, 72 F.(2d) 279, 282 (C.C.A.2).

■ The making of a loan by the plaintiff and the negotiating of security on which it was to be made is obviously an act within the defendant Harriman's apparent authority as president of the Harriman Bank, and that bank, therefore, is charged with Harriman's knowledge of the agreement which I find he made with the plaintiff to put the 15,000 shares of the stock of the Standard Oil Company of New Jersey as collateral under the loan which the plaintiff was seeking, and this is so, even if, as in this case, through Harriman's fraud the Harriman Bank did not receive the benefit which the plaintiff expected it to receive. Gleason v. Seaboard Air Line R. Co., 278 U.S. 349, 356, 357, 49 S.Ct. 161, 73 L.Ed. 415; Lloyd v. Grace, 1912 App.Cas. 716.

Harriman's fraud seemed to me to be shown beyond the slightest doubt. He was admittedly the dominant factor in the Harriman Bank, and there is no escape that his knowledge of the fraud must be deemed to be the bank's knowledge. Cf. Curtis, Collins & Holbrook Co. v. United States, 262 U.S. 215, 222, 43 S.Ct. 570, 67 L.Ed. 956; J. J. McCaskill Co. v. United States, 216 U.S. 504, 514, 515, 30 S.Ct. 386, 54 L.Ed. 590; Anderson v. Missouri State Life Insurance Co., 69 F.(2d) 794, 795, 798 (C.C.A.6); Kean v. National City Bank, 294 F. 214, 222–224 (C.C.A.6); Schneider v. Thompson (C.C.A.) 58 F.(2d) 94, 97; Wassmann et al. v. City National Bank, 52 F.(2d) 705, 707 (C.C.A.6).

■ The receiver of the Harriman Bank took over the situation cum onere.

■■ If there were any innocent party involved in this case, the situation might be different. There might then be an estoppel owing to the negligence of the plaintiff in having signed a number of blank papers without seeing to it that they were properly filled in; but as this is a case between the original parties or those in privity with them, there cannot be any estoppel by reason of this negligence.

A mere lack of prudence towards himself is not such negligence as makes the signer of an instrument under estoppel except to an innocent purchaser for value. Richards v. Day, 137 N.Y. 183, 33 N.E. 146, 23 L.R.A. 601, 33 Am.St.Rep. 704; Hulburt v. Walker, 258 N.Y. 8, at pages 16, 17, 19, 179 N.E. 34.

It seems to me that the blank letter of hypothecation which the plaintiff signed addressed to the Harriman Bank and which seems to be relied on by the defendants cannot be regarded as anything but an inchoate instrument. It was not filled in in any respect; it was merely a form signed by the plaintiff. I do not see how any one reading it could possibly have supposed that it conferred any right on the Harriman Bank with regard to any particular security, and, therefore, I think that it cannot be relied on as a basis for any kind of a claim of bona fides by the Harriman Bank even if the question of the knowledge of Harriman's fraud was not under the authorities cited above thoroughly brought home to it.

It seems to me that when there has been negligence on one side by a plaintiff in signing documents which were not filled in and, on the other side, when it is found that the defendant is guilty of fraud, the duty of a court of equity is to chancer the situation in all its aspects and to determine

whether the acts of negligence could have led an innocent party to change his position in reliance on the documents in question, or on some development of the situation which those documents may have made possible. But before one can have an innocent third party, one has to find a third party, and here there is none.

In effect, I am asked by the defendant in a case between the original parties or those in privity with them, where the proof shows negligence on the one side and fraud on the other, to decide in favor of fraud. This cannot be done.

■ III. When the respective rights of the parties come to rest therefore under my decree, the situation will be repaired so that they will be in statu quo ante as far as it is possible to put them in that position, for the plaintiff will have such of his stock and other collateral as has not gone into the possession of an innocent holder for value; and the damages caused by the Harriman Bank to the plaintiff will have been repaid to him, and the receiver of the Harriman Bank will have had its loan repaid to it, with interest, less such damages.

IV. The above may stand as the findings of fact and conclusions of law in this case, and an order to that effect may be submitted at the time when the interlocutory decree is submitted, or it may be included in the interlocutory decree. Such procedure is adequate to comply with the present rules.

But if the parties prefer to have more detailed findings of fact, they must be settled before the interlocutory decree is entered, and, if there are to be any such further findings of fact, I suggest that they be submitted by each of the opposing parties to the other in draft form, and that there be a hearing before me for the final settlement of such findings if they cannot be agreed between the parties on the basis of the opinion I have expressed above. Such hearing must be on or before June 19, 1935.

If the findings of fact are to be settled, give 3 days' notice after arranging a date convenient to me. But if there are not any findings of fact other than those contained in my opinion, settle order making the opinion the findings of fact and conclusions of law and the interlocutory decree on 2 days' notice.