**MUNROE v. HARRIMAN et al.**

District Court, S. D. New York.

July 11, 1935.

Miller, Boston & Owen, of New York City (Harold H. Corbin, Edward J. Bennett, and Herbert F. July, all of New York City, of counsel), for plaintiff.

Paul W. Williams, of New York City (Edward McDuffie, of New York City, of counsel), for defendant Harriman and M. R. O. Co., Inc.

O'Brien, Boardman, Hewitt, Memhard & Early, of New York City (John V. Hewitt, Edward F. Butler, and Hobart Brinsmade, all of New York City, of counsel), for defendants Harriman Nat. Bank & Trust Co. of City of New York and Frederick V. Goess, as receiver.

Rushmore, Bisbee & Stern, of New York City (C. Horace Tuttle and George N. Hamlin, both of New York City, of counsel), for defendant Austin.

KNOX, District Judge.

That Joseph W. Harriman, who, at the time of the inception of the transaction here in controversy, was president of Harriman National Bank & Trust Company, was thoroughly dishonest, and a cheat of the first magnitude, admits of no doubt. In the later days of his power he became desperate, and engaged in a series of frauds so reckless and unconscionable as to beggar description and approach unbelief. Inevitably, the crash came, and the wreckage was widespread. The bank failed. Its stockholders were subjected to assessments, its depositors have received but a part of their money, and the fortunes of friends who trusted in Harriman's integrity, if not wiped out, have been endangered. The present suit is concerned with a state of facts of the latter type. In the execution of the scheme in which plaintiff was the victim, Harriman not only perpetrated a fraud upon Munroe, but utilized its fruits in the commission of further wrongs against the bank. The real issue here presented for decision is whether, under the law, the cost of Harriman's misdeeds is, in this instance, to be visited upon Munroe or upon the bank's depositors.

The determinative facts are these: Plaintiff is a lawyer who left his profession to engage in corporate business affairs. Meeting with success, he accumulated considerable wealth. He and Harriman had a social acquaintance and were fellow members of the directorate of Columbia Gas & Electric Company. Prior to June 8, 1932, the men had participated in no personal transactions, although Harriman had futilely solicited Munroe to become a depositor in the bank, and to buy its stock. On the evening of the day above mentioned, Harriman telephoned plaintiff at his home in Greenwich, Conn., and inquired if he had some New York Stock Exchange collateral that was not in use. Receiving an affirmative reply, Harriman said that he would like to borrow collateral of a value of about $200,000. Munroe said he would furnish the same if he could be made absolutely safe, and if the securities

would be returned within two or three months. An appointment was made for the following day at Munroe's New York office. When the participants then met, Harriman enumerated a number of his property holdings. These included tapestries, real estate mortgages, and a farm, none of which was recognized as stock exchange collateral. He also possessed, so he said, a large quantity of stock of Harriman National Bank & Trust Company, which at that time, had a nominal value of $600 per share. Had it not been that Harriman had been making unlawful use of the funds of the bank in supporting the market for its stock, it is safe to say that no such quotation would have been possible. As subsequently appeared, this stock was not in favor as collateral at lending institutions. It was finally agreed between Munroe and Harriman that the latter should deliver 1000 of the shares to Munroe as security for the return of the collateral which the latter was to lend. The shares were represented as paying annual dividends of 25 per cent. while the stock of an affiliate which was to accompany the bank shares was said to be paying dividends of $7 per annum. Munroe inquired about the bank's condition, and was told that it was "as clean as a whistle." Being asked if he had suffered losses in the depreciation of security prices that recently had taken place, Harriman replied, "I have not been hurt * * * at all—I am financially sound and will give you a statement." Plaintiff answered that a statement was unnecessary, and that he would furnish the accommodation desired. His excuse for ready acquiescence is the flattery he felt in thinking that the president of a great bank should ask him for such a favor. In addition, he regarded Harriman as a wealthy and respected member of an old and distinguished family. So willing was plaintiff to be of aid that Harriman, in reply to his inquiry as to what Munroe wanted for his accommodation, was told that no consideration was desired. A cynic, however, might smile a bit if he were to be told, as was the fact, that a few hours after Harriman and plaintiff came to an understanding the latter called Harriman on the wire and asked that his son-in-law be given a position in the bank. Harriman readily assented, and the young man in whom plaintiff was interested got a subordinate job in the institution. At the conclusion of the talk had between the principals in plaintiff's office, and arrangements being made for a completion of the transaction, Harriman started to leave the office, remarking, as he did so, that, in view of the sensitiveness of a bank's credit, he hoped Munroe would treat their negotiations confidentially. Munroe gave assent. The next day Harriman either delivered or sent to Munroe a typewritten memorandum which was to evidence the terms of the transaction. Its phraseology not being entirely agreeable to plaintiff, he dictated a counter memorandum as follows:

"New York, N. Y. June 14, 1932.
"I hereby acknowledge receipt of the following securities from Charles A. Munroe, which are endorsed in blank:
2,000 shares Union Tank Car Company,
10,000 shares Petroleum Corporation of America
1,000 shares National Dairy Products Corporation
500 shares National Biscuit Company
3,000 shares General Baking Company
3,000 shares American Radiator & Standard Sanitary Corp.
2,000 shares United States Gypsum Company
1,500 shares United Shoe Machinery Corporation
all common stocks.
"I agree to deliver to Charles A. Munroe, at his office, 61 Broadway, New York, N. Y., the foregoing stocks, or stocks of a similar amount, in the same companies, on September 15, 1932, the sum of Two Hundred and twenty-five Thousand Dollars ($225,000.00); and as security for the faithful performance of the above, I hereby deposit with Charles A. Munroe, one thousand (1,000) shares of the Harriman National Bank and Trust Company stock, endorsed in blank.
"This stock of the Harriman National Bank and Trust Company is to be returned to the undersigned upon the return of the securities as above set forth.
"Witness: Joseph W. Harriman."

The purpose of specifying that any default in returning the securities might be covered by a cash payment of $225,000 was to overcome the possibility that a quick realization upon the bank stock could not be had.

Upon June 14, 1932, the above-quoted paper had been signed by Harriman; it was taken to Munroe by the defendant Austin, who was the bank's executive vice president. Plaintiff, meanwhile, removed his securities from the safe deposit vault where they were kept, and indorsed them in

blank. They were in Munroe's office when Austin called. The certificates being checked against the recitals in Harriman's receipt, they were handed to Austin. In return therefor Austin handed Munroe 10 certificates of 100 shares each of Harriman National Bank & Trust Company standing in the name of J. A. M. A. Corporation— a personal holding company which Harriman controlled. The certificates had been indorsed in blank. Munroe, observing that he was not being furnished with a resolution of the board of directors of J. A. M. A. Corporation authorizing the indorsement, spoke of the fact. Austin said that the bank acted as its own transfer agent and that it would transfer the stock as Munroe requested, whenever presented. This statement, being put in the form of a letter which was then dictated and signed by Austin, satisfied Munroe and the transaction concluded.

So far as plaintiff's peace of mind was concerned, the matter ran along well enough until July 5th. En route to New York on that day he saw a newspaper item to the effect that Harriman bank stock was selling at $230 per share. This information was of startling quality, and plaintiff lost no time in endeavoring to reach Harriman by telephone. He did not succeed. Upon one pretext or another access to Harriman was denied. Thereupon Munroe called at the bank and saw its controller, William A. Burke, laying the situation before him. A letter on behalf of plaintiff was also mailed to Harriman. Burke promised to get in touch with Harriman and to see that more collateral was delivered to plaintiff. This interview was followed by a letter from Burke, dated July 8, 1932, which undertook to assure Munroe that the collateral he required would soon be available, and likewise would be satisfactory to him. This was followed, probably upon July 12th, by a delivery by Harriman to Munroe of 3,240 shares of capital stock of J. A. M. A. Corporation as additional security. Some days later Munroe obtained a balance sheet of the company. Upon its examination the stock appeared to be worthless. Thereupon plaintiff consulted W. W. Miller, his attorney, and a personal acquaintance of Harriman. Upon July 22, 1932, Miller wrote him a letter of rather circumspect character. Apparently it was designed to protect Munroe without arousing antagonism from Harriman. Response to this communication was made a week later and in these words:

"July 29, 1932

"Dear Billy—

"Sorry I have not been able to be at the bank during the past week, but I know you will understand.

"You will understand, also, that there need be no fear that Charlie Munroe will not get his securities back on September fifteenth. The additional security that I have given is worth considerably more than the bank stock, because it covers properties of the family organization—the J. A. M. A. Corporation.

"Munroe has been so considerate and kind in this emergency, he would be the last one to suffer from any remissness on my part.

"Sincerely yours,

"J.M.H.

"Mr. William W. Miller,
"Hornblower, Miller, Miller & Boston,
"15 Broad Street,
"New York City."

While the foregoing events were taking place, Harriman had been relieved of his duties as president of the bank and was nominally made "Chairman of the Board." His place as president was filled by Henry E. Cooper. Miller made an appointment for an interview on July 28, 1932, with Judge Davies, who sometimes acted as attorney for the bank. Judge Davies being called away, Miller talked with Cooper on that date.

Some statement should here be made as to what happened to Munroe's securities upon coming under Harriman direction and control. No sooner was he satisfied that plaintiff's securities would quickly be in hand than the consummation of further frauds upon the bank was put in process of execution. On June 10th, he caused the bank to advance $200,000 upon the note of M. H. O. Company, Inc., which, like J. A. M. A. Corporation, was under his control. At the same time he caused 10,000 shares of the capital stock of Standard Oil Company of New Jersey to be deposited as collateral security thereon. This stock, the tracing of which I shall not attempt to follow, did not belong to Harriman, but had been obtained through trickery and chicane practiced upon Dr. Preston Satterwhite. See Satterwhite v. Harriman Nat. Bank & Trust Co. (D.C.) 13 F.Supp. 489, decided June 4, 1935. This was in preparation for

344

the ultimate disposition of Munroe's securities. In line therewith, Harriman called Austin to his office and told him of the arrangements that had been with plaintiff. Austin, being supplied with a check of the cashier of the Harriman bank in the sum of $150,000, was instructed to take the same to the National City Bank where he should pay off a note of J. A. M. A. Corporation in like amount, and which had been secured by a pledge of 2,000 shares of Harriman bank stock. Upon possessing himself of these shares, Austin was to hand 1,000 of them to Munroe, and receive the collateral being loaned to Harriman. The stock certificates going to make up this collateral were to be delivered to Harriman's bank with instructions that they be transferred to M. H. O. Company, and be placed as collateral for a loan which the bank was making to that company. Austin had scarcely started upon his mission when Harriman told Evan W. Hughes, who looked after the affairs of his personal companies, to draw a note of the M. H. O. Company in the sum of $380,000, payable to the bank. When this had been done, Hughes was to secure the return of the M. H. O. Company's note of June 10, 1932, in the sum of $200,000, and substitute the larger obligation in its place. The additional credit thus set up provided funds for the payment of $150,000, being made to the National City Bank, and to discharge an obligation of $30,000 which Harriman owed his bank, and which was incurred in carrying out still another fraud that need not here be detailed. Without attempting to describe the kitings and other deceptive acts that Harriman then directed, let it be said that it was not long before Munroe's securities were apparently validly pledged as security for loans of $380,000 advanced to serve the purpose of Harriman.

At this point a return should be had to the interview that plaintiff's attorney had with Cooper on July 28, 1935. Miller had learned of the advances made by the bank upon plaintiff's security. Consequently, in his discussion with Cooper, the latter was told, if it were not understood that further advances should not be made thereon, and that the collateral, together with dividends paid thereon, should remain unprejudiced in the bank's possession until the entire situation was clarified, resort to appropriate legal proceedings would be had. Cooper replied that the matter should be taken up with counsel for the bank. On August 4th Miller saw Davies, to whom the demands

were repeated, and by whom they were pronounced reasonable. At this stage of negotiation, the affairs of the bank were in anything but a happy condition. It was seeking aid from Washington, where it was under severe stricture, and it was also an object of solicitude on the part of the New York Clearing House Association. Miller saw various persons in interest on the predicament of Harriman and his bank, and they, for the most part at least, were deeply anxious that a critical condition should not result in fatality. These persons expressed hopefulness in the outcome. In the interval thus brought about, Harriman's financial status was the subject of more or less searching examination, and on September 13, 1932, Munroe received a report of the investigation. It was anything but reassuring, and upon September 16th he made formal demand upon both Harriman and the bank for a return of his securities and offered to redeliver such as had been deposited with him by Harriman. Compliance therewith not being made, this suit was begun in late December, 1932. In passing, it may be said that, notwithstanding the information which had been brought to the attention of Burke, Cooper, and Davies, the M. H. O., Inc., loans were subsequently increased in the amounts and upon the dates about to be specified: July 14, 1932, $10,000; August 23, 1932, $1,500; August 31, 1932, $2,500.

Upon the foregoing facts, and such others as may subsequently appear herein, plaintiff asks that the agreement under which his securities were loaned to Harriman, together with any and all papers, instruments, and agreements made or executed thereunder by any of the parties in suit, be rescinded, annuled, canceled, and set aside, and, further that he reacquire possession of his stock certificates, as well as dividends, now in possession of the receiver, which have been paid thereon. Before proceeding to a decision, let it be remembered that Harriman Bank & Trust Company continued to do business until the bank holiday which began on March 4, 1933. After that closing, the bank never again opened its doors for the transaction of business in ordinary course. On the contrary, it was found to be insolvent, and its affairs, in due time, passed into control of the defendant receiver for the purposes of liquidation.

Coming now to a determination of the issue—attention should at once be given to

the question of the bank's knowledge of Harriman's misdeeds. Counsel for the bank relies strongly upon the doctrine declared in American National Bank v. Miller, 229 U.S. 517, 521, 33 S.Ct. 883, 57 L. Ed. 1310, and followed in Re United States Hair Company (C.C.A.) 239 F. 703, to the effect that an officer of a corporation in dealing with it upon his own account will not be presumed to disclose those matters of which he has knowledge and which it is his interest to conceal. For this reason, it is said the bank, in advancing money on plaintiff's securities, acquired no notice of the deceit that Harriman practiced upon Munroe in obtaining their possession and control. As against this contention, argument is made that this case falls within a well-recognized exception to the rule announced in the above-entitled cases in that Harriman, in his personal dealings with the bank, was the only one of its executives who, on its behalf, really directed its course of conduct. Anderson v. Missouri State Life Insurance Company (C.C.A.) 69 F.(2d) 794, 795; Curtis, Collins & Holbrook Company v. United States, 262 U.S. 215, 43 S.Ct. 570, 67 L.Ed. 956. The proof in this case compels a finding that, when the bank dealt with Harriman in regard to his personal affairs, it was he, and he alone, who spoke authoritatively, and acted upon behalf of the institution. He had filled its executive staff and its loan committee with a number of complaisant persons who owed their respective positions, and their hope of a continuance therein, to Harriman's grace. They stood ready to do his bidding whenever required. In fact, they dared do nothing else. Hence it was that whenever Harriman, or one of his companies, wanted a loan, as often as false entries in the books were thought desirable, when securities, whether pledged to Harriman or to the bank were to be used to suit his wishes, the object desired immediately was attained. Thereupon his sycophants would be summoned to his aid and the deed, through their penciled initials would be ratified. So far as my recollection runs, I never recall having been made familiar with an organization so completely dominated, and the object of such one-man dictation, as in this bank. What Harriman said and did was outwardly accepted by his subordinates, whatever their mental reservations, as the acme of wisdom and propriety. For all practical purposes, Harriman was the bank. Under conditions as he made them, it is self-deceptive and idle to attempt to construct a fictional theory whereby the bank can be relieved of the consequences of his knowledge of the falsehoods and misrepresentations through which he gained possession of Munroe's securities, and of his intentions when, to serve his personal ends, he caused the bank to accept them as collateral, for the advance to himself of further sums of money. The directorate of the bank, and its executive staff, through inaction and fear, permitted him in dealing with himself to be the exclusive agent of the bank. Wasmann v. City National Bank of Knoxville, Tennessee (C.C.A.) 52 F.(2d) 705.

■ Holding as I must that the bank never became an innocent and bona fide pledgee for value of Munroe's securities, it cannot retain them as against plaintiff's demand. The duty of the bank to return the securities to Munroe arose at the time he made demand therefor. So far as appears, the institution was not then insolvent. In the absence of such proof, it is difficult to see how the balancing of the equities of depositors against those of Munroe can properly be taken into account. Until insolvency became an actuality, the equities, I should suppose, if there is any difference in them as a result of the bank's failure, were as between Munroe and the bank, as a going institution. Indeed, counsel for the receiver in his reply brief says, "We are not urging immunity for stockholders of a solvent corporation." As was stated in Marr v. Tumulty, 256 N.Y. 15, 24, 175 N.E. 356: "* * * Shareholders must suffer for the wrong committed by their officers." If it be that the resources of the bank at the time of the Munroe transactions were sufficient to cover the loss occasioned by Harriman's wrong, and if depositors, in theory at least, could then have been paid in full, it would hardly seem as though Munroe, even assuming his childlike faith in Harriman's integrity to have been negligent and foolish, contributed to their plight.

■ As for the contention that plaintiff, by reason of the terms of his agreement with Harriman, was willing, as of the day of its date, to accept a sum in lieu of the return of his securities which is only about half of their present value, I think it to be without merit. If plaintiff has a right to rescind the agreement, as seems to be true, he may do so to the extent that no equity of an innocent party intervenes. It is

wholly immaterial that the securities to the return of which plaintiff is entitled have increased in value over the period of litigation. But for a set of circumstances over which none of the parties exercised control, the value of the securities might have declined. Had such been true, the rights of the parties would not have changed.

When plaintiff came to the realization that an imposition had been practiced upon him, and demanded a return of his securities, no estoppel prejudicial to his right to a rescission of his agreement had come into existence. There was of course a period of time within which Munroe would have been entirely satisfied to forego rescission had he been adequately secured against loss either by Harriman or his friends. Within this space, Munroe is chargeable with some indecision which, under other circumstances, might militate against his right to the relief now claimed. However, as revealed by this record, I think he is not open to too much criticism. The times were exceedingly parlous. Responsible persons in the bank who undoubtedly were aware of its condition, and who had become suspicious, if not certain, of Harriman's perfidy seem to have inclined Munroe and his attorney towards the belief that everything would be all right. Indeed, precipitate action with its attendant publicity might well have produced the disaster which the bank and its officers were trying to avoid. But, however this may be, the course pursued by Munroe, so far as I can observe, resulted in no prejudice to the bank or the other defendants. He made their situation no worse and, in the view of the bank, may have been doing something that was believed to be helpful.

The fact that plaintiff's securities were reflected in the totals of the bank's assets and liabilities, as set forth in statements published subsequently to their pledge with the bank, should not serve to defeat relief to Munroe. He had nothing to do with such statement. If they showed a condition of affairs in which Munroe's securities improperly played a part, the fault belongs primarily to the misconduct of Harriman and to the failure of the executive officers of the bank to give sound management to the institution. No person has been produced who asserts that he was misled by any act of commission or omission on the part of plaintiff. In fact, for all here presented, no depositor who became such after the transactions under review took place ever had knowledge of the dealings between Munroe and Harriman until the bank had failed.

So far as the defendant Austin is concerned, I think the bill of complaint may be dismissed as to him. Whether he was aware of the baseness of Harriman, and a conscious participant in his conduct, is problematic. But, whatever the fact, he was so thoroughly under the dominance of Harriman that, in the latter's transactions with the bank, he exercised not the slightest independent judgment. Completely subjugated by his master, and fearful of his displeasure, he responded with a yea or a nay as and when either response was desired.

Let a decree be presented as against the other defendants which will provide for a return to Munroe of the securities loaned to Harriman as of June 14, 1932, together with any and all dividends thereon which have not as yet come to the plaintiff.