## CURTIS, COLLINS & HOLBROOK COMPANY *v.* UNITED STATES.

### (And Twenty-three Other Cases.)

APPEALS FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 341, and Nos. 342–364. Argued April 9, 10, 1923.—Decided May 21, 1923.

1. Where stockholders of a corporation, imposing no safeguard other than that the paper titles should be passed on by a reputable attorney, entrusted another stockholder, who was also vice president and active manager of the company, with the business of

procuring title to lands, to be patented under the Timber and Stone Act, for which he was to be paid a stated sum per acre, and where lands were so procured, by means of frauds on the act, of which the person thus acting as agent for all had knowledge, and by means of conveyances from the fraudulent entrymen to a naked trustee and from the trustee to the corporation, *held,* that the knowledge of the agent was imputable to the corporation and all its shareholders, and that the defense of *bona fide* purchaser was not available to the corporation in a suit by the United States to annul the patents because of the fraud.  P. 221.

2. Where an agent employed to procure titles to land, procures it, contrary to his instructions, through a fraud practiced on the owner, the fact that the agent has an adverse or independent interest in that, having a share in the adventure, his own profits will increase with the number of titles procured, cannot save his principal from imputation of the agent's knowledge in a suit by the landowner to set aside the conveyances because of the fraud. P. 223.  *American National Bank* v. *Miller,* 229 U. S. 517, distinguished.

3. The defense of *bona fide* purchaser is an affirmative one, and the burden of sustaining it rests upon the party who asserts it. P. 225.

275 Fed. 670 and 674, affirmed.

In November, 1912, the United States filed seventy-nine bills in the District Court of the United States for the Northern District of California, seeking to set aside patents for land in the Susanville land district in California, issued by it under the Timber & Stone Act (Act of Congress, June 3, 1878, c. 151, 20 Stat. 89, as amended by Act of August 4, 1892, c. 375, § 2, 27 Stat. 348), to various patentees and by them conveyed to one Gregory, and by him to the Curtis, Collins & Holbrook Company, a corporation of California, on the ground that the patents had been obtained by fraud.  The entries were filed and the patents were issued in the last six months of the year 1902, and shortly thereafter.  The cases were consolidated into groups, were referred to a Master who reported at length, finding that, as to the seventy-nine patents, only twenty-four had been obtained in fraud of the United

States and in violation of the statute, but that as to all
of these, the Curtis, Collins & Holbrook Company was a
*bona fide* purchaser for value without notice of the fraud.
The District Court sustained the findings of the Master
and dismissed the bills.   The United States then prose-
cuted appeals as to the twenty-four patents whose issue
had been found by the Master to have been obtained by
fraud, to reverse the finding by the Master and the Dis-
trict Court, that the Curtis, Collins & Holbrook Company
was a *bona fide* purchaser without notice of the fraud.
The Circuit Court of Appeals of the Ninth Circuit, to
which the appeals were taken, found with the Govern-
ment on this issue, reversed the decree of the District
Court in the twenty-four cases, and remanded them with
direction to cancel the patents.   The Curtis, Collins &
Holbrook Company has now prosecuted appeals to this
Court in all these twenty-four cases, under § 241 of the
Judicial Code.   The parties, as the Master did below, se-
lected as a typical case, of the twenty-four cases in which
fraud was found, the patent issued to one Edward L.
Cooksey.   That has been argued in this Court, with the
understanding that the other twenty-three cases are to
abide the decree in this, because the facts, so far as notice
of the fraud is concerned, are substantially the same.

   In 1901, persons owning lands within the limits of the
National Forests, could convey them to the United States
and select in lieu thereof, and secure title by patent to,
timber lands belonging to the United States outside of
the forest reservations.   One Tuman and C. H. Holbrook
agreed to seek capitalists and induce them to purchase
lands in forest reservations and exchange them for timber
land outside.   Tuman was a cruiser who had prepared a
list of desirable lieu lands which could be selected.   In
December, 1901, Holbrook made a contract with Curtis
and Collins by which he agreed to sell to them at $7.50 an
acre forty-two thousand acres of timber land in Cali-

fornia—described in a schedule—title to which Holbrook
was to obtain by conveying to the United States lands of
the same amount in National Forest reservations. The
forest reservation lands were to be conveyed to Thomp-
son, trustee, by the owners, who were to be paid upon
request of Holbrook and on an attorney's certificate of
title, not exceeding $5.00 an acre, to be paid by the Bank
of California out of a fund of $200,000 deposited with it
by Curtis and Collins. The trustee was then to make
application for the lieu lands described in the list and
when he had acquired title he was, upon notice from
Holbrook that he had been paid, to convey to Curtis and
Collins or to anyone to whom they directed. After the
title to the whole amount had been acquired, Holbrook
was to receive the balance of the price for the lands
amounting to more than $115,000, partly in cash and
promissory notes and in 789 shares of stock in a corpora-
tion of California to be formed with 5,000 shares of $100
par value each, to which the lands were to be conveyed.
Curtis and Collins were to receive 3,156 shares, 1,844
shares remaining in the treasury, out of which Holbrook's
shares were to be taken. Holbrook was to be a director
and vice-president and general manager. If Holbrook
could not secure the whole of the 42,000 acres from the
forest reserve rights, he was given the right to obtain it
through any other legal means or source.

Holbrook and his son, with Tuman's assistance, pro-
cured the whole 42,000 acres in lieu of forest reservation
lands. Holbrook reported to Curtis and Collins that
forest reservation lands had become scarce and expensive
and suggested that there were valuable timber lands
which could be secured under the Stone & Timber Law
*ubi supra.* Under this law, land belonging to the United
States, valued chiefly for timber or stone, and unfit for
cultivation, in quantities not exceeding 160 acres, could
be sold to a citizen of the United States at a minimum

price of $2.50 an acre.   But any person seeking such land was required to file with the register of the proper district a written statement, under oath, in duplicate, setting forth a number of necessary facts concerning the land and also that he " has made no other application under this act; that he does not apply to purchase the same on speculation, but in good faith to appropriate it to his own exclusive use and benefit; and that he has not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons whatsoever, by which the title which he might acquire from the government of the United States should inure, in whole or in part, to the benefit of any person except himself."

Curtis and Collins accepted Holbrook's suggestion as to the Stone & Timber Law, and it was orally agreed that about 30,000 acres should be thus acquired and that Holbrook was to be paid $10.00 an acre.   The entries in this and the other twenty-three cases were procured by agents of Tuman, who made entries under an agreement to convey the lands to anyone he might direct, he paying all the expenses and $100 for each entry, and the entrymen making false oaths in violation of the statute.   The land thus entered was conveyed by the entrymen to one Gregory whose name was used with his consent as trustee by Tuman and Holbrook.   Gregory neither paid nor received any money and merely acted as a conduit for the titles.   All the stone and timber entries were filed in the last six months of 1902, and the deeds to Gregory were made soon after proof by the entrymen, but were not recorded until 1904.   The Curtis, Collins & Holbrook Company was organized in accord with the terms of the original contract, August 14, 1902, the incorporators being J. G. Curtis and his son, D. G. Curtis, T. D. Collins and his son, E. S. Collins, Charles H. Holbrook, and his son, Charles H. Holbrook, Jr., and Irving

F. Moulton. Gregory conveyed to this corporation the interests conveyed to him by the entrymen at different times up to 1904, but none of the deeds to the corporation was recorded until October, 1909, and some were not recorded until 1910 and 1911.

Curtis and Collins lived in Pennsylvania but they, together with Tuman and Holbrook, went out to look at the lands in 1902, after the contract was made. D. G. Curtis, who was treasurer of the Company, also frequently went upon the lands. Young Curtis testified that he talked much with Holbrook who managed the Company and did everything in connection with the acquisition of these lands by it and that they all had the utmost confidence in his getting them good titles.

Tuman and Holbrook fell out as to the division of the profit between them. Collins, Sr., effected a compromise whereby Tuman received 200 shares in the Company and $10,000 cash; and after this litigation was begun Collins paid Tuman $750 a share for this stock, although it was twice what it was worth as Collins admitted. Tuman was a witness and testified that he told Holbrook what he had done in procuring the entries to be made and in paying expenses and the $100 apiece to the entrymen, and there was evidence strongly tending to show that the money used to pay these expenses came from an account in a San Francisco bank, opened by Holbrook in the name of Collins and Holbrook, upon which checks were drawn in favor of an account in Holbrook's name in a bank at Susanville upon which Tuman drew checks for this work. There was no evidence that Collins knew of the San Francisco account in the name of Collins and Holbrook. There was evidence that in 1904 and 1906, land office agents were investigating the validity of entries made as to other lands suspected of having been sold in advance to the Curtis, Collins & Holbrook Company, and that Tuman, Holbrook and Collins talked over

the matter, and that Collins agreed they were lost and " that was all there was to it."

*Mr. Charles A. Shurtleff,* with whom *Mr. Robert B. Gaylord* and *Mr. Morris R. Clark* were on the brief, for appellant.

*Mr. S. W. Williams,* Special Assistant to the Attorney General, with whom *Mr. Solicitor General Beck* and *Mr. Assistant Attorney General Riter* were on the brief, for the United States.

MR. CHIEF JUSTICE TAFT, after stating the case as above, delivered the opinion of the Court.

The Circuit Court of Appeals attached importance to the conduct of Collins toward Tuman and the compromise made between him and Holbrook, to his willingness to abandon other titles secured by Holbrook when questioned, and to the long delay in recording the deeds to the Company (*Linn & Lane Timber Co.* v. *United States,* 236 U. S. 574, 576) as suspicious circumstances indicating a consciousness on the part of the capitalists in the Company that the titles of the Company to the lands here in question were vulnerable because of the practices of Holbrook and Tuman. Without minimizing the significance of these circumstances, we put our concurrence in the decree of the Circuit Court of Appeals on the other ground stated by that court.

While the contract of December, 1921, called it a sale of 42,000 acres of forest reservation lieu lands by Holbrook to Curtis and Collins, we think that in the light of all the circumstances, it was rather a contract of agency and joint adventure by which Holbrook was to procure the land for his principals at a stipulated profit for himself, they to furnish the money with which he could make the purchases for them. Even if the written contract

would not bear this construction, the practical construction by the parties justifies it; and this is especially true of the subsequent oral contract under which the additional 30,000 acres of stone and timber land was to be purchased. The title to the land was never put in Holbrook, or in Curtis and Collins. Through a naked trustee, it was conveyed directly from the entrymen to the Company. The whole procedure under the Stone & Timber Act was entrusted by Curtis and Collins to the initiation and execution of Holbrook as the manager and vice president of the Company, in which Curtis and Collins had three-fifths interest, and Holbrook had one-sixth. The only safeguard imposed was that a reputable attorney was to pass on the paper title. The Company was in being and under the active management of Holbrook when these entries were being made and final proof submitted. Holbrook knew of the fraud practiced on the Government in making the entries, because Tuman says that he told him, and the circumstances as to the payment of money for expenses and bonuses out of moneys furnished by Holbrook confirms his complicity in it.

Under these circumstances, we do not think the Company can be treated as a *bona fide* purchaser. It is charged with Holbrook's knowledge because he was the sole actor for the Company in procuring the fraudulent patents. It sufficiently appears that young Curtis, the treasurer of the Company, and Curtis and Collins, the capitalists, understood the difference there was between the procedure and limitations attending the acquisition of title to lands under the Forest Reservation Act and under the Stone & Timber Law, and that they depended wholly on Holbrook to secure a good title under the latter act.

The general rule is that a principal is charged with the knowledge of the agent acquired by the agent in the course of the principal's business. Here the business was

the acquisition of land patented by the Government under the Stone & Timber Act. The Company and all its stockholders were charged with notice of any facts impairing the titles, of which in securing them, Holbrook was advised. In other words, the Company in taking over the titles took them *cum onere*. *Hovey* v. *Blanchard,* 13 N. H. 145; *Warren* v. *Hayes,* 74 N. H. 355; *Atlantic Cotton Mills* v. *Indian Orchard Mills,* 147 Mass. 268, 273; *Bank of New Milford* v. *Town of New Milford,* 36 Conn. 93, 101; *Holden* v. *New York & Erie Bank,* 72 N. Y. 286, 294; *First National Bank* v. *Dunbar,* 118 Ill. 625, 632; *Fouche* v. *Merchants National Bank,* 110 Ga. 827, 848; *Wilson* v. *Pauly,* 72 Fed. 129, 135; Mechem on Agency, 2d ed., Vol. 2, § 1818.

Appellants seek to avoid the application of this principle by asserting an exception to it when the agent's attitude is one adverse in interest to that of the principal, because of which it can not be inferred that the agent would communicate the facts against his own interest to his principal. The case relied on to establish this exception is that of *American National Bank* v. *Miller,* 229 U. S. 517. In that case one who was president of a bank at Macon, Georgia, owed his own bank $3,000, and paid it by a check on a Nashville bank in which he was a depositor, but which he owed $50,000. The Nashville bank received the check from the Macon bank for collection and then credited the Macon bank with the amount and sent a letter advising the Macon bank. The president of the Macon bank was insolvent and a petition of involuntary bankruptcy was filed against him the day his check was credited by the Nashville bank. The Nashville bank sought to charge off the credit to the Macon bank on the ground that that bank was chargeable with notice of its president's insolvency. We held that such knowledge could not be imputed to the Macon bank merely because the president knew it, for the reason that it was not to be

inferred that he would communicate such knowledge to his own bank.

We do not think the case applicable here. The president of the Macon bank was engaged in something in which his interest was plainly independent of any agency of his on behalf of his bank. His payment of his note was his own business, and not the bank's as his principal. In the case at bar, Holbrook was the sole agent acting for the Company in securing titles to land for it. It is true that the more titles he got the more profit he would make out of the agency, and we may assume that as between him and the Company in securing fraudulent titles for the Company, he was violating his instructions; but he and the Company were in a common adventure, and if the Company insists on retaining the fruits of that adventure, it must be charged with the knowledge of the agent through whom the fruits came. The interest of Collins, Curtis and Holbrook in the acquisition of the titles was common. Curtis and Collins knew exactly how far Holbrook's interest was adverse to theirs, but trusted him in the joint enterprise notwithstanding. The adverse interests as between them in sharing the fruits of the common business can not enable the Company to retain its share and repudiate the agent with all he knew. This view is sustained by the authorities above cited; it was taken by the Circuit Court of Appeals and we concur in it.

Appellant relies on the cases of the *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, and *United States* v. *Clark,* 200 U. S. 601, to justify the plea of *bona fide* purchase in this case. The facts in those cases were different from the facts in the case before us. In the *Detroit Company Case,* there was no question of agency at all. It was the purchase by one company from another and it was sought to charge the purchasing company with knowledge of the vendor's violations of the statute by

assuming that if the purchaser had looked into its books it might have inferred something irregular. The Court held that there was nothing to put the purchaser on such an inquiry. In the *Clark Case,* Clark bought outright from Cobban by direct warranty deeds lands patented under the Stone & Timber Act. It did appear that Cobban had negotiations with Clark before Cobban acquired title to some of the land, and it further appeared that Clark lent money to Cobban secured by mortgage on land and timber owned by Cobban to enable him to buy additional land. But this Court and the two lower courts held that Clark and Cobban dealt at arm's length. We found expressly that the claim that Cobban was Clark's agent broke down.

These two cases were seemingly relied upon by the Master and the District Court to show that the defense of *bona fide* purchaser is not an affirmative defense, the burden of sustaining which is on the defendant; but such a construction of those cases is refuted by the express ruling of this Court in *Wright-Blodgett Co.* v. *United States,* 236 U. S. 397.

We think the case before us comes within the class of cases of which *McCaskill Co.* v. *United States,* 216 U. S. 504, and *United States* v. *Kettenbach,* 208 Fed. 209, 219, are instances.

*Decree affirmed in this and the other twenty-three cases.*