## GENERAL SECURITIES CORPORATION v. CITY OF HOMEWOOD, ALA.

### No. 6967. -

Circuit Court of Appeals, Fifth Circuit.

Nov. 15, 1933.

Rehearing Denied Dec. 14, 1933.

R. H. Scrivner and J. T. Stokely, both of Birmingham, Ala., for appellant.

Walter Brower and Jim C. Smith, both of Birmingham, Ala., for appellee.

Before BRYAN, FOSTER, and HUTCH-ESON, Circuit Judges.

HUTCHESON, Circuit Judge.

This suit was brought by the city of Homewood to recover $90,000, the purchase price of bonds it had sold defendant. The only defense was payment. This was rejected by the jury, and plaintiff had a verdict.

Appellant, assigning many and various errors, comes complaining that by the judgment it has been made to pay twice for the bonds it bought. All of its assignments, however, relate to the one question; whether, in view of the complete insolvency of the bank on January 9, 1930, within the full knowledge of King, the vice president, cashier, and general manager of the bank, and president of the defendant company, his procuring the city treasurer on that day to accept a deposit slip of the bank for $90,000 constituted payment. Appellant insists that it did. Appellee that it did not.

Appellee urges that the whole scheme of having the city and the defendant go through the motions of transferring from the defendant's account to the city's in a hopelessly insolvent bank, the $90,000 bond money, was devised, engineered, and executed by King to defraud the city in the interest and for the use and benefit of the defendant company. It insists that the result he aimed at, to have the bank become debtor to the city, in place of the defendant, failed of accomplishment because of his fraud. Appellant insists that the knowledge of the insolvency of the bank obtained by King as its manager, and not in the course of the business of the defendant, cannot be imputed to defendant as its knowledge, especially in view of the undoubted fact that had it known of the bank's condition it would not have maintained its deposit of $42,-000 there. Appellee counters that the general knowledge of the defendant as to the condition of the bank for other purposes than the shifting of its loss to the city's shoulders is beside the point; that no other conclusion may be drawn from the evidence than that King, as banker, did in fact communicate to King as president, for the purpose of saving the defendant to the extent of the bond money, the condition of the bank. That it was exactly because he had this knowledge in mind that King, as president of the defendant, was so urgent and in such haste to complete the transfer that night to save the $90,000. That there was not conflict, but community of interest between King, the commercial banker, and King, the investment banker, in regard to saving the investment company at the city's expense. That in such circumstances, the evidence showing it was his knowledge of the condition of the bank which activated him in what he did for the defendant company, it is wholly unreasonable to say that as its president he did not have knowledge of the condition.

A further claim of appellee was that as the sale of the bonds was for cash, there could be no payment unless the city received cash or its equivalent, and that the deposit slip of the bank was not the equivalent of cash, unless at the time it was given there was cash

enough in the vaults of the Bank of Ensley to have paid it out, if the city had then demanded it.

The trial court took plaintiff's view on both points. Refusing defendant's motion for a directed verdict it sent the case to the jury on two issues; whether there was enough cash in the vaults of the Ensley Bank on January 9th to have paid the city's check for $90,000, and whether King, knowing the bank was insolvent, acted in the transaction of the deposit as the agent and representative of the defendant company, and for its use and benefit.

Appellant insists that whether the bank had cash in its vaults sufficient to pay the check would be immaterial if, in fact, the city accepted the bank as its debtor in lieu of defendant. It complains of the charge as in effect one to find for plaintiff, because under the undisputed evidence though the Ensley Bank had sufficient cash in its own vaults and those of its correspondents together, it did not have that much in its own vaults, and because the court directly charged the jury that they could not consider cash in the vaults of other banks but only that in the vaults of the Ensley Bank itself. Montgomery County v. Cochran (C. C. A.) 126 F. 456. They complain further of the charge as to King's agency on the ground that generally, and particularly under the decisions of Alabama, the knowledge of King, obtained as an officer of the bank, could not be imputed to him as the president of defendant. Girard Fire & Marine Ins. Co. v. Gunn, 221 Ala. 654, 130 So. 180; American Nat. Bank v. Miller, 229 U. S. 517, 33 S. Ct. 883, 57 L. Ed. 1310.

▮ While we do not agree with appellant that the court erred injuriously to it in submitting the issue of King's agency, we do agree with it that there was error in charging that no payment would result unless there was that much cash unappropriated in the vaults of the Ensley Bank, and that the charge of the court was, under the evidence, in effect a peremptory instruction for plaintiff.

The law is well settled that, fraud aside, a creditor may accept another in lieu of his debtor, and that this acceptance if so intended will constitute payment wholly without regard to the solvency or insolvency of the new debtor. Montgomery County v. Cochran (C. C. A.) 126 F. 456; Fullerton Lbr. Co. v. Chicago, M., St. P. & R. Co., 282 U. S. 520, 51 S. Ct. 227, 75 L. Ed. 502; City National Bank v. Burns, 68 Ala. 267, 44 Am. Rep. 138.

We do not think, however, that the judgment should be reversed. It should be affirmed, we think, on the ground that the error in so charging the jury was harmless, because under the facts a verdict was demanded for plaintiff. Without conflict, they show that King, through whose activities in exploiting its resources for his personal benefit the bank had been for months before the transaction in question going from bad to worse, acting for the defendant and in its interests, used his knowledge of the condition of the bank in informing and directing his course. He knew that it was only a matter of days or hours before it must close. In the interest then, of the defendant company and for the purpose of shifting to the city the burden of the loss which his company was then bearing, he pressed the city to an immediate conclusion of the matter so that not his company, but the city, would find itself, when the bank closed, a creditor to the extent of $90,000 of his wrecked institution. No other conclusion can possibly be drawn from the evidence than that, knowing that the bank's failure was inevitable, and acting for his company to save it from loss, he undertook fraudulently from the beginning to so manipulate the bond account as to put the burden of the failure on the city. The controlling facts may be briefly stated.

Since at least June, 1929, when the Bank of Ensley had been designated by the city the depository for the deposit of its funds, including trust funds, the city of Homewood had been a depositor with the Bank of Ensley, of which King, vice president and cashier, was the manager, and on January 9th it had three accounts with the bank; its general fund account, its special account for the proceeds of series D bonds, and its special account for the proceeds of series E bonds. Long a director of the defendant, in October, 1929, King became its president. For some time it too had been a depositor with the Bank of Ensley. On January 9th it had on deposit, according to the books of the bank, $42,852.49. In December, 1929, the city, having bonds to sell, defendant among others arranged to bid. As a part of these arrangements King, as president of the defendant company, and as manager of the bank, having ascertained that the city would keep the money obtained from the sale, except an amount sufficient to pay the city's notes to the bank, $20,000 on deposit and unused for some time, agreed that the bank would supplement the defendant's bid by $3,037, the estimated value to the bank of the deposit. Arrangements, too, had been made with a Cincinnati bond house to take seventy of the bonds from

defendant at a price of $68,014.33. Sold on December 20 at public auction, Lindsey, vice president of the defendant company, delivered seventy of the bonds to King for shipment to Cincinnati with sight draft for $68,014.33. King, of his own motion, made out a deposit slip in favor of the city for the amount of the draft, giving Lindsey a duplicate of it. As no claim is, however, made that the city accepted payment before the 9th, this slip is immaterial except as it throws light on King's interest, and interprets his later actions. On January 6th the draft was paid, and the proceeds were transmitted to the Chase National Bank at the request and for the credit of the Bank of Ensley. In the afternoon of the 9th, though the mayor had had an understanding with the defendant that the city would not need the money on the bonds until between the 10th and 14th, King, acting for defendant, urged the mayor to send a representative to the bank that afternoon, stating, we have plenty of money and we want to settle for the bonds. At about the same time King sent to the office of the defendant and obtained its check on the Bank of Ensley, payable to the city, for $19,442.67 which, with the proceeds of the draft and the $3,037 to be paid by the bank, represented the full $90,000 due the city for the bonds. After the treasurer had been located, and gone to the bank, and King had given him the check and the deposit slip for the price of the bonds, he opened a new account designated "Series L Improvement Bonds" and deposited the entire amount in it. At the same time he gave the bank a receipt for $90,000. Then, drawing his check for $20,000 against this fund in favor of the general fund, he gave the bank a check on the general fund in payment of the city's notes for that sum. Two of the notes were delivered to him; one of them, being hypothecated, he never got, and the city had to pay again.

At the time these transactions occurred, the bank was hopelessly and irretrievably insolvent, and wholly unable to go on, within the knowledge of King.

But, says the appellant, King did not acquire the knowledge he had of the condition of the bank in the conduct of the business of the defendant. He acquired it while acting adversely to the interest of defendant and under circumstances which make it certain he would not have disclosed it to the defendant, a depositor in his bank. Both, then, because the knowledge sought to be imputed to the defendant was acquired by King outside of the line of his duties to the defendant, Girard Fire & Marine Ins. Co. v. Gunn, 221 Ala. 654, 130 So. 180, and because it being to King's interest to conceal the insolvency of the bank, both on his own and on the bank's account, the law would not by a fiction charge the defendant with notice of the bank's insolvency, American Nat. Bank v. Miller, 229 U. S. 517, 33 S. Ct. 883, 57 L. Ed. 1310, appellant urges that the knowledge King had is wholly beside the question.

While the general rule is that a principal will not have imputed to him knowledge acquired by his agent, outside of the scope of his duties, in regard to a matter as to which the interests of the agent and principal are adverse, the rule has its definite limitations, and will not be applied contrary to reason and common sense. Thus it is that, while it might well be that in a controversy between the defendant and the bank, King's knowledge of the bank's insolvency could not be imputed to the defendant, in a matter between the city and the defendant, it must be otherwise, for King, having no conflicting interest, was in a position to use, and did use, for the benefit of the defendant, the knowledge he had of the bank's condition to press through a settlement designed by him to shift from the defendant to the city the burden of the heavy loss which the bank's failure would entail. In this situation it is not fictional, but real, to say that King, the president of the investment company, acquired for the use and used in the interest of, that company from King, the manager and manipulator of the Bank, the knowledge he had gained as such. In such a situation the rule applies that the defendant takes the benefits of the settlement which King's knowledge of the condition of the bank enabled him to put through before it failed, cum onere, entitled to the benefits, if any, which it might have obtained from King's knowledge, subject equally to the burden which that knowledge entailed. Curtis, Collins & Holbrook Co. v. U. S., 262 U. S. 215, 43 S. Ct. 570, 67 L. Ed. 956; Pollman v. Curtice (C. C. A.) 255 F. 628; The Distilled Spirits, 11 Wall. 366, 20 L. Ed. 167; Taylor v. Commercial Bank, 174 N. Y. 181, 66 N. E. 726, 62 L. R. A. 783, 95 Am. St. Rep. 564; Pine Mountain Iron & Coal Co. v. Bailey (C. C. A.) 94 F. 258.

The judgment is affirmed.