In re NEW ENGLAND MARINE SERVICES, INC., Debtor.

In re BUNKER GROUP VIRGINIA, Debtor.

Bankruptcy Nos. 192–19865–260, 192–20590–260.

United States Bankruptcy Court, E.D. New York.

Nov. 15, 1994.

Backenroth & Grossman by Abraham Backenroth, New York City, for debtors and debtors-in-possession.

Thacher, Proffitt and Wood by Christopher F. Graham, New York City, for Water Quality Ins. Syndicate.

### DECISION ON MOTIONS FOR PRELIMINARY INJUNCTIONS

CONRAD B. DUBERSTEIN, Chief Judge.

This matter comes before the Court upon orders to show cause dated January 26, 1994, brought on by New England Marine Services, Inc. ("NEMS") and Bunker Group Virginia, Inc. ("BGV") (hereinafter collectively referred to as the "Debtors")[1] seeking preliminary injunctions enjoining Water Quality Insurance Syndicate ("WQIS") from cancelling pollution liability insurance it provides to them. The Debtors allege that the cancellation of their insurance by WQIS violates the stay imposed by section 362 of the Bankruptcy Code ("Code").[2] After a series of hearings on the motions, the Court reserved its decision and determined that preliminary injunctions would remain in effect until it renders its ultimate decision.

### I. Facts

The Debtors are related marine fuel and transport companies. Peter Frank ("Frank") is the current president of the two Debtor corporations.

Although the Debtors have restricted the scope of their fuel sale operations, they continue to own and operate numerous tugboats and barges throughout the coastal waters of the United States and Puerto Rico. Marine companies, including the Debtors, are required by federal law to maintain various types and amounts of insurance coverage.[3] In 1990, to obtain the required pollution coverage, the Debtors contacted Windward International Inc. ("Windward"), an insurance broker. Windward contacted various underwriters, and eventually arranged for WQIS, a conglomerate of numerous insurance underwriters primarily serving the marine industry, to underwrite said insurance. Through Windward, WQIS and the Debtors entered into numerous insurance agreements between 1991 and 1994.

Because Windward acted as their intermediary, there was no direct dealing between the Debtors and WQIS until commencement of this case.[4] All communications between WQIS and the Debtors were filtered through Windward, and all documentation received by the Debtors, except for certain quotation schedules,[5] were on Windward's letterhead.

While covered by WQIS's insurance, severe financial difficulties prompted the Debtors to file their voluntary petitions and seek relief under Chapter 11 of the Code. NEMS filed on November 20, 1992 and BGV filed on December 4th, 1992. Frank remained the principal of both debtors-in-possession pursuant to sections 1107 and 1108 of the Code.

---

1. Bunker Group New York ("BGNY"), a related entity and Chapter 11 debtor at the time, also brought an order to show cause requesting the same relief. However, on May 17, 1994 an order was entered dismissing BGNY's case.

2. All section references hereinafter, unless otherwise indicated, are to the Bankruptcy Code, 11 U.S.C. 101 *et seq.*

3. This coverage includes, *inter alia*, protection and indemnity insurance, hull and machinery, and pollution insurance coverage. *See, e.g.,* Oil Pollution Act of 1990, Pub.L. No. 101–380, 104

stat. 484 (codified as amended 33 U.S.C.A. § 2716 (1990)), which requires the responsible party to maintain adequate or requisite oil pollution insurance coverage.

4. In fact, Frank testified that "[he] never spoke to WQIS until November [of 1993]." Trans. Feb. 9, 1994 at 71.

5. These quotation schedules were sent to Windward from WQIS. Windward, in turn, attached them to the documentation that they sent to the Debtors. These schedules shall be addressed later in this opinion.

Although covered by WQIS's insurance at all pertinent times, the Debtors never received an officially authorized WQIS "policy" until February 1993, as discussed below. However, each year prior thereto, the Debtors received documentation from Windward evidencing insurance agreements reached between it and WQIS as set forth as follows.

*Pertinent Facts in 1991*

On March 13, 1991, the Debtors received a "facsimile policy" from "Windward", on Windward's letterhead.[6] The cover letter which accompanied this facsimile policy reads in pertinent part as follows:

> While awaiting the actual WQIS Policy which has not yet been issued we [ (Windward) ] have prepared the enclosed facsimile policy.

Debtors' Trial Exhibit A.

The facsimile policy entitled "By This Policy of Insurance" stated that it was "[s]ubject to WQIS policy to be issued".[7] The facsimile policy was sent by Windward to the Debtors because WQIS had not yet issued its actual policy. It simply served as a clarification of the vessels that the policy covered and a base upon which endorsements could be issued.

*Pertinent Facts in 1992*

In 1992, as in the previous year, neither the Debtors nor Windward received an official policy from WQIS. At trial, however, the Debtors produced a document covering 1992 which contained language and information similar to that contained in the prior years facsimile "policy of insurance." This document also included the statement, "[s]ubject to WQIS policy to be issued."[8]

*Pertinent Facts in 1993*

In January of 1993, as part of the agreement for that year, Windward sent another document to the Debtors, although this one was entitled "Confirmation of Insurance."[9] It, like the aforementioned 1991 and 1992 facsimile policies, included the condition that it was "[s]ubject to WQIS Policy to be issued."[10] Hence, for the third successive year, the Debtors had not received an officially authorized policy from WQIS.[11] The reason for this, according to Richard Hobbie ("Hobbie"), WQIS's President, was that WQIS's official policy was in a state of flux due to the passage of the Oil Pollution Act of 1990,[12] which created the need for the revision of WQIS's standard policy form. However, by no means were the Debtors operating without pollution insurance.[13]

Finally, in February of 1993, WQIS completed the revision of its policy form, and it issued it to all WQIS producers, including Windward. At the top of the revised form appeared the title "Water Quality Insurance Syndicate Policy Form—1992".[14] This revised form contained many of the provisions in WQIS's prior standard policy form including an at-will cancellation clause,[15] now "Sec-

6. Debtors' Trial Exhibit A.

7. *Id.*

8. Debtors' Exhibit B–1.

9. Debtors' Trial Exhibit B–3. This document appeared on Windward's letterhead and was introduced into evidence by the Debtors.

10. This document also includes the following statement:
> This confirmation is intended for the use as evidence that insurance described herein has been effected against which a policy or policies will be issued, and that, in the event of any inconsistency herein, the terms, conditions and provisions of the policy or policies will prevail.

Debtors' Trial Exhibit B–3.

11. This would have also held true for Windward had it not been for the revised WQIS policy which Windward received in February of 1993. This document will be discussed *infra.*

12. *See supra* note 3.

13. Indeed, such is not the controversy here, as evidenced by WQIS's substantial damage payments in response to the sinking of one of the Debtor's barges, the Morris J. Berman, on January 7, 1994. *See also* Tran. Feb. 9, 1994 at 190–91.

14. "1992" is part of the title of this document although it actually covered 1993.

15. According to Hobbie's testimony, such clauses were not new to WQIS. Hobbie indicated that these clauses have been a part of WQIS's standard policy form since 1971. *See* Tran. Feb. 9, 1994 at 133. *See also* WQIS Trial Exhibit 6 (this is a sample of a prior standard policy form used by WQIS which contains the unilateral cancellation clause).

tion H," which reads in pertinent part as follows:

> Either WQIS or the Assured may cancel the policy, or any part thereof, for any reason, by giving the other party thirty days' notice of such intention in writing.

WQIS Trial Exhibit 7.

The Debtors claim that they never saw this revised policy form and assert that they never knew such a cancellation clause ever existed. Only Windward received a copy of this policy form, and according to the evidence, never passed it on to the Debtors.

In November of 1993, WQIS informed Windward, and not the Debtors, that, in accordance with "Section H" of the 1993 policy, all coverage of the Debtors' vessels would be terminated in thirty days.[16] At the time Windward received this letter, it was in possession of WQIS's 1993 policy form which explicitly contained "Section H." Specifically, the intended termination by WQIS was due to grave concerns that it had regarding the operations and management of the Debtors.[17]

After a series of talks and a lengthy meeting on November 23, 1993, WQIS agreed not to cancel the 1993 policy.[18] Although throughout these talks, Windward possessed WQIS's termination letter, which clearly indicated that the termination was pursuant to "Section H," the at-will termination clause contained in the 1993 policy, Frank testified that he presumed that WQIS's intended termination was simply based upon the Debtors' non-payment of premiums.

Subsequently, negotiations between the Debtors, Windward, and WQIS were held in order that WQIS might underwrite a new insurance policy for 1994 (the "1994 Policy") because the 1993 policy was set to expire on December 29, 1993. Insurance for 1994 was crucial to the very existence of the Debtors. In addition to the statutory requirement which mandated that the Debtors maintain adequate insurance coverage, the Debtors also faced an order of this Court, dated December 3, 1993, which enjoined them from operating their business without providing written proof of insurance coverage to Metlife, a creditor which held a security interest in one of the Debtors' primary vessels.

With full knowledge of the Debtors' bankruptcy and precarious financial situation, WQIS agreed to continue to cover the Debtors for 1994. Its concession to continue doing business with the Debtors was ultimately based on personal assurances by Frank that the Debtors were significantly improving their operations and management systems.[19] On December 28, 1993, the Debtors accepted WQIS's insurance coverage for the period of December 29, 1993 to December 29, 1994. *See* Debtors' Trial Exhibit B-9.

On January 7, 1994, one of the vessels insured by WQIS, the barge MORRIS J. BERMAN, which was leased to an entity licensed to do business within the Commonwealth of Puerto Rico, was involved in a disastrous oil spill off Puerto Rico's Coast.[20] As a result, WQIS was subjected to a claim of $10 million. WQIS has not disputed this claim and has substantially honored it.

The original desire of WQIS to continue to insure the Debtors throughout the pendency of its Chapter 11, was offset by the stark reality that the Debtors were no longer insurable risks. On January 14, 1994, WQIS

16. This letter, addressed to the Debtors and sent c/o Windward, reads, in pertinent part, as follows:

> In accordance with the Part IV—General Terms, Conditions and Limitations—Section H of the Policy, we hereby give notice of Cancellation.

WQIS Trial Exhibit 2.

17. These concerns turned out to be prophetic. *See supra* note 13.

18. When subsequently asked why he didn't question the cancellation clause, Peter Frank claimed that, because the Debtors had been late in paying their insurance premiums, WQIS was simply invoking their right to cancel for non-payment. According to Frank, "[i]t was my understanding that there was one cause that a policy could be cancelled for and that was non-payment of premiums." Tran. Feb. 9, 1994 at 65.

19. For example, Frank had broken up the marine fleet, originally known as Standard Marine Services, Inc., into separate companies, to make them run more efficiently and not be dependent on one another. Tran. Feb. 9, 1994 at 57.

20. *See supra* note 13.

notified Windward that the Debtors' pollution coverage would be canceled in thirty days.[21] WQIS once again claimed that it was terminating the Debtors' policy pursuant to "Section H," the at-will termination clause. Upon this notification of cancellation from Windward, the Debtors once again claimed that they had never seen this policy and were unaware that any such cancellation provision ever existed.

The Debtors emphasize that they will effectively be put out of business if WQIS is permitted to cancel the 1994 policy. By applications dated January 26, 1994, the Debtors brought the instant orders to show cause seeking to enjoin WQIS from terminating insurance coverage for the vessels because the insurance contract is property of the estate pursuant to section 541(a)(7), and as such, its termination is in violation of the automatic stay provisions of section 362 of the Code. Opposition was filed, evidentiary hearings were held, and subsequently, this Court reserved decision until a more comprehensive review of the facts could be ascertained.

## II. *Analysis*

### *WQIS's Cancellation of the 1994 Policy Does Not Violate Section 362*

The Debtors assert that WQIS's termination of the 1994 Policy constitutes a violation of section 362(a)(3) which provides, *inter alia*, that all entities are stayed from any act to obtain possession or exercise control over property of a debtor's estate. In support of their assertion, the Debtors point to section 541(a)(7) which, in pertinent part, defines property of the debtor's estate as "any interest in property that the estate acquires after the commencement of the case." Thus, they argue that because their 1994 Policy with WQIS is property of their estates, WQIS is stayed from terminating it.

Indeed, many courts have found that insurance policies are property of the debtor's estate, and are subject to the bankruptcy court's jurisdiction. *See MacArthur Co. v.*

*Johns–Manville Corp. (In re Johns Manville),* 837 F.2d 89, 92 (2d Cir.1988), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988); *A.H. Robins Co. v. Piccinin (In re A.H. Robins Co.),* 788 F.2d 994, 1001 (4th Cir.1986), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *Minoco Group of Companies v. First State Underwriters Agency of New England Reinsurance Corp. (In re Minoco Group of Companies),* 799 F.2d 517, 519 (9th Cir.1986); *Tringali v. Hathaway Machinery Co.,* 796 F.2d 553, 560 (1st Cir.1986). Although such findings represent the courts' concern that such insurance policies deserve the stay protection provided by section 362, this Court notes that the subject policies in each of these cases were entered into *prepetition.* However, in the case at bar, the 1994 Policy was entered into *postpetition.*

■ An analysis of the case law relevant to postpetition insurance agreements reveals that an insurer of a debtor is entitled to cancel a *postpetition* insurance policy pursuant to its contractual provisions without lifting the stay on the grounds that the stay never became effective. *See In re Douglas,* 18 B.R. 813, 815 (Bankr.W.D.Tenn.1982); *Bolin Oil Co. v. Reliance Insurance Co., (In re Bolin Oil Co.),* 51 B.R. 936, 939 (Bankr. N.D.Ohio 1985); *Bogey's Barn, Ltd. v. Indiana Ins. Co. (In re Bogey's Barn Ltd.),* 47 B.R. 555, 556 (Bankr.S.D.Fla.1985); *Heaven Sent, Ltd. v. Centennial Insurance Co. (In re Heaven Sent, Ltd.),* 50 B.R. 636, 639 (Bankr.E.D.Pa.1985).

■ This Court finds that by attempting to cancel the 1994 Policy, WQIS is simply invoking "Section H" of said Policy which generally provides that either party has the ability to cancel it on thirty days notice. This Court also notes that no evidence has been introduced to suggest that WQIS's termination of this bargained-for policy stemmed from a motive or was rooted in any contractual provision that may constitute a

---

**21.** *See* WQIS Trial Exhibit 5. This letter, addressed to Joseph Cacici of Windward, reads, in pertinent part, as follows: "In accordance with

part IV Section H of the contract we hereby tender our thirty day notice of cancellation of insurances...."

violation of section 365(e),[22] which protects a debtor from post-petition cancellations of contracts pursuant to *ipso facto* clauses conditioned on a debtor's insolvency or bankruptcy. In fact, WQIS was well aware of the Debtors' status as a Chapter 11 debtor when it issued the 1994 Policy.

■ The Debtors assert that this Court should continue to enjoin WQIS from cancelling the 1994 Policy pursuant to its own provisions. However, "nothing in the Bankruptcy Code ... enlarges the rights of a debtor ... or ... prevents the termination of the insurance under the policy's own cancellation provisions." *Bolin,* 51 B.R. at 939 (*quoting Douglas,* 18 B.R. at 815). "To require an insurance carrier to abandon its contractual rights as [the Debtors'] request, is tantamount to sending notice to all insurance companies that when dealing with a debtor-in-possession, contractual provisions are of no import." *Bolin,* 51 B.R. at 939 (citation omitted).

*The 1994 Insurance Policy is a Postpetition Contract*

■ The Debtors alternatively argue that the 1990 facsimile policy[23] "was a valid and binding contract of insurance"[24] entered into prepetition, and that the 1994 Policy simply represents a renewal of the prepetition policy. Thus, the Debtors assert that because the 1994 Policy is a renewal of the *prepetition* 1990 policy, it should be afforded the protection of the automatic stay.

The Debtors correctly cite *A.H. Robins, Minoco Group* and *Tringali* to support their assertion that a prepetition insurance policy is property of the Debtors' estate and thus is protected by the automatic stay. *See* Debtors' Post–Trial Memorandum at 14. Never-

theless, these cases give no indication that the policies in question were postpetition renewals of prepetition policies. In fact, an analysis of the background of this case and the relevant New York case law reveals that the 1994 Policy is an agreement that is separate and distinct from the 1990 policy, and thus constitutes a postpetition contract.

As WQIS indicates in its Post–Hearing Brief, it is clear that the 1994 Policy was distinctively different from the 1990 policy insofar as:

(1) the premiums were different;

(2) the vessels covered were different;

(3) the vessels were listed on separate schedules;

(4) a new account number was issued; and

(5) a new policy cancellation endorsement was added that provided for retroactive cancellation of the coverage back to the inception date in the event that the premium was not paid in full in sixty days.

■ Under New York law, the renewal of an insurance policy constitutes a separate and distinct contract with a period of time covered by the renewal. *See Gladstone v. Metropolitan Life Ins. Co.,* 66 Misc.2d 656, 657, 322 N.Y.S.2d 528 (N.Y.C.Civ.Ct.1971); *accord Liberty Mutual Ins. Co. v. Mann (In re Supreme Meat Co.),* 73 F.R.D. 295, 296 (E.D.Mo.1976) ("It is clear ... that the renewal of an insurance policy constitutes a separate and distinct contract with a period of time covered by the renewal.")

■ In addition, under New York law, "where the insurer has the absolute right to terminate a policy on its anniversary date, each renewal of the policy is deemed the issuance of a new policy." *Moore v. Met.*

---

**22.** Section 365(e) reads, in pertinent part, as follows:

Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title;

.    .    .    .    .

**23.** This was the document written by Windward and, according to Hobbie, was never seen nor approved by WQIS.

**24.** Debtors' Post–Trial Memorandum at 2.

*Life Ins. Co.,* 75 Misc.2d 168, 346 N.Y.S.2d 298 (Sup.Ct.N.Y.Cty.1972), *aff'd,* 41 A.D.2d 601, 340 N.Y.S.2d 586 (1st Dep't 1973), *aff'd,* 33 N.Y.2d 304, 352 N.Y.S.2d 433, 307 N.E.2d 554 (1973). . Pursuant to "Section H," both the Debtor and WQIS had the right to terminate on any date, as long as 30 days notice was given.

Thus, under New York law, and the facts of this case, this Court finds the 1994 Policy, issued by WQIS to the Debtors, is a postpetition contract, separate and distinct from the original 1990 policy. And, while it recognizes that the termination of its insurance policies may force the Debtors to cease their operations, this Court must also recognize the contractual right of WQIS to enforce their postpetition contract. *See Bolin,* 51 B.R. at 939; *Bogey's Barn,* 47 B.R. at 556; *Heaven Sent,* 50 B.R. at 639.

■ Relatedly, the Debtors insist in their Post–Trial Memorandum, that when the insurance contracts were renewed each year, they were renewed under the identical terms and conditions of the 1990 policy, which the Debtors claim contained no such at-will cancellation provision. They claim that WQIS's tender of cancellation, pursuant to "Section H," of the 1994 Policy form, was invalid because no such termination provision ever existed.

After a thorough review of the testimony taken and the evidence submitted, this Court finds that the 1994 Policy was indeed subject to an at-will termination clause. Windward was well aware that such a provision existed and, as appears in the following discussion, Windward was the Debtors' agent.

*Windward was the Broker and Agent of the Debtor*

■ The Debtors have attempted to persuade this Court that Windward was not their agent. In the alternative, the Debtors suggest that Windward was the agent of both the Debtors and WQIS. However, both relevant statutes and case law, the latter of which is the virtual antithesis of the Debtors' position, combined with the testimony given

at the February 22, 1994 hearing by Joseph Cacici ("Cacici"), Windward's vice-president, makes it abundantly clear to this Court that Windward was in fact the Debtors' broker and in that capacity was their agent as well.[25]

In response to the Debtors' contention, WQIS points to Article 21 of the New York Insurance Law entitled "Agents, Brokers, Adjusters, Consultants, and Intermediaries." Specifically, section 2101(c) reads:

In this article, 'insurance broker' means any person, firm, association, or corporation who or which for any compensation, commission or other thing of value acts or aids in any manner in soliciting, negotiating, or procuring the making of any insurance or annuity contract or in placing risks or taking out insurance, on behalf of an insured other than himself or itself or on behalf of any licensed insurance broker. . . .

N.Y.Ins.Law § 2101(c) (McKinney's 1985).

According to Cacici's testimony, it is standard procedure in the insurance industry for a company seeking insurance coverage to approach an insurance broker such as Windward to procure coverage. Thus, Cacici testified, the company desiring insurance becomes the "client" of the broker. According to Cacici, the broker then analyzes the specific needs of that client and seeks an insurance company to underwrite the desired coverage. If the insurer chooses not to underwrite the policy, then the broker looks to a different insurer to attain coverage for its client. If the insurer elects to write the insurance, then the insured has to agree to payment of the insurance premiums before the deal is complete.

Based upon the lengthy testimony taken at trial, it is apparent that the negotiations between the Debtors, Windward, and WQIS, between 1990 and 1994, for the procurement of pollution insurance, progressed under the standard procedures identified above by Cacici. Applying the facts of this case to section 2101 of the New York Insurance Law, it is patently clear to this Court that Windward is the insurance broker of the Debtors.

**25.** While this Court well recognizes New York case law which differentiates between an "insurance broker" and an "insurance agent," such case law is not pertinent here. For the purpose of the case at bar, the term "agent" refers to the agency-type relationship between the parties.

It is also clear under New York law that an insurance broker is an agent of the insured. *Kamyr, Inc. v. St. Paul Surplus Lines Insurance Co.*, 152 A.D.2d 62, 65, 547 N.Y.S.2d 964 (3d Dep't 1989) ("[i]t is well established in this State that an insurance broker is the agent of the insured"); *American Motorists Ins. Co. v. Salvatore*, 102 A.D.2d 342, 345, 476 N.Y.S.2d 897 (1st Dep't 1984) (stating that an insurance broker is a "representative of the insured"). *See also Matco Products, Inc. v. Boston Old Colony Ins. Co.*, 104 A.D.2d 793, 796, 480 N.Y.S.2d 134 (2d Dep't 1984); *Jet Setting Service Corp. v. Toomey*, 91 A.D.2d 431, 459 N.Y.S.2d 751 (1st Dep't 1983) (broker is the agent of the insured).

The Court recognizes, however, as asserted by the Debtors, that under certain special circumstances, a broker may act as an agent for both the insured and the insurance company. *See Hesselberg v. Aetna Life Ins. Co.*, 75 F.2d 490 (8th Cir.1935) *cert. denied*, 296 U.S. 623, 56 S.Ct. 144, 80 L.Ed. 442 (1935). The Debtors, however, make this assertion to demonstrate that Windward had the authority to bind WQIS to the 1990 insurance policy, which the Debtors claim was subsequently renewed each year without "Section H." Because this Court has determined that the 1994 Policy is an agreement separate and distinct from the 1990 policy and that Windward is the agent of the Debtors, the Debtors' argument is rendered moot.

Nevertheless, if it were necessary for this Court to make such determination, the weight of the evidence presented suggests that Windward was not the agent of WQIS. Both the testimony of Cacici of Windward and Hobbie of WQIS clearly indicates that Windward was the Debtors', and not WQIS's agent.

Cacici particularly testified that Windward was the agent of the Debtors and only the Debtors. When questioned by the Court as to who he worked for, Cacici replied, "Mr. Frank is my client." Tran. February 22, 1994 at 128. During that same hearing, Ca-

cici described how Windward began doing business with Frank and how it solicited and procured pollution insurance for his "client."

Hobbie's testimony given on February 9, 1994, on behalf of WQIS, indicated that Windward was never authorized to bind WQIS. In fact, when asked whether Windward was "authorized to issue a Policy of Insurance for WQIS?" or if he had "ever authorized any broker to sign on behalf of WQIS?", Hobbie answered in the negative. Furthermore, he stated that "WQIS had never granted an agency [to Windward]." [26]

"A mere insurance broker cannot be converted into an agent of the insurance company, without evidence of some action on the part of the company or of facts, from which a general authority to represent it might be fairly inferred." *Hesselberg*, 75 F.2d at 492 (*quoting Allen v. German–American Ins. Co. of N.Y.*, 123 N.Y. 6, 15, 25 N.E. 309 (Ct.App. 1890)). As the testimony of Hobbie is clear, Windward was without authorization to act on behalf of WQIS, and this Court maintains that Windward was, and is, the agent for the Debtors, not WQIS.

*Windward is the Debtors' Broker and Agent and Had Knowledge of the "Section H" Cancellation Clause*

██ Windward had known since February of 1993 that WQIS Policy Form–1992 was the "policy to be issued" cited in the numerous documents sent by Windward to the Debtors. As previously mentioned, in February of 1993, Windward received a copy of the new policy form along with a cover letter annexed. The first paragraph of the cover letter stated: "[t]he language of [the] new policy form with respect to the liabilities under the Oil Pollution Act of 1990 has now been completed. We are enclosing a copy of the policy form."

The Debtors have expressed doubt as to whether that cover letter meant that the revised policy was actually then in effect, and claim that the letter gave no direction or requirement that the 1992 Policy Form be

---

**26.** Hobbie explained that it would be an unlawful act for him to create an agency-type relationship because, "[t]he articles of agreement of Water Quality Insurance Syndicate, the articles amongst 17 members *preclude the granting of agencies . . . ."* Tran. Feb. 9, 1994 at 129 (emphasis added).

included in all new WQIS policies. *See* Debtors' Post–Trial Memorandum at 8. Any doubts that the Debtors had, should have been easily resolved by Windward, its broker, which received the quotation schedules from WQIS for the period covering 1994.[27] These schedules contain specific references to "Aggregate Limit of Liability per Section A Part II—Limit of Liability," which is a section of the 1992 Policy Form, which, in fact, contained "Section H." In fact, these quotation schedules were accepted by the Debtors as part of their 1994 agreement with WQIS.[28]

In addition, for the following reasons, Windward was well aware that the WQIS coverage was subject to a termination provision. In November of 1993, Windward's Vice–President, Jonas Boahene, made handwritten notes which specifically refer to the thirty day termination provision. The notes read, in pertinent part:

November 1st 1993:

Water Quality Insurance Syndicate gave notice of cancellation to assured in accordance with Part IV, "Section H," of the policy. Assume this is 30–day notice, so policy is canceled 12/1.

WQIS Trial Exhibit 9.

Jonas Boahene testified that this was a "handwritten note from me to the file." Tran. Feb. 22, 1994 at 145.

In January of 1994, the binders sent by Windward to WQIS and the confirmation sent by Windward to the Debtors, memorializing Windward's understanding of the contract, contained the revised policy with the termination provision. *See* Tran. Feb. 22, 1994 at 127–28.

Thus, it is abundantly clear to this Court that Windward was the Debtors' broker and agent and was well aware of "Section H" in the Debtors' 1994 Policy.

*Windward's Knowledge of "Section H" is Imputed to the Debtors*

Although the Debtors may have had no knowledge of the termination clause, they will still be bound by their agent's knowledge. *See Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 457 (6th Cir.1982) (*citing Curtis, Collins, & Holbrook Co. v. United States*, 262 U.S. 215, 43 S.Ct. 570, 67 L.Ed. 956 (1923)). The court in *Ford* stated that: "[T]he general rule is that notice to or knowledge of an agent may be imputed to the principal in certain situations. Notice or knowledge is imputed where the agent is acting within the scope of his authority and the knowledge pertains to matters within the scope of the agent's authority." *Id.* at 457.

The facts of this case indicate nothing that suggests that Windward was acting or had knowledge outside the scope and authority of its agency relationship with its principal, the Debtors. Thus, Windward's knowledge of "Section H," the at-will termination clause is imputed to the Debtors.

*Other Factors Justifying Decision*

Finally, this Court recognizes other factors which further justify its decision which unfortunately for the Debtors, may ultimately contribute to their demise as Chapter 11 Debtors.

The letter received by Windward in January of 1994 from WQIS which indicated that WQIS intended to cancel the policy pursuant to "Section H," was not the first of its kind. As previously mentioned, WQIS had also sent a similar notice of cancellation to Windward in November of 1993. Frank, however, claimed that he thought that both the November 1993 and January 1994 notices of cancellation were based on the Debtors' failure to completely pay their premiums and not for any other reason, and claimed com-

---

**27.** The Debtors received quotation schedules each year which indicated that their insurance was underwritten by WQIS. These schedules contain relevant information regarding the coverage such as the names of the covered entities, the vessels covered, and the amount of premiums.

**28.** *See* Debtors' Post–Trial Memorandum. Cacici testified, and the Debtors stress in their memorandum, that the only portion of the January 21, 1994 Binder which was part of the agreement was the "term sheet and attached quotation schedule."

plete surprise upon the notifications of termination pursuant to "Section H." [29]

Although Frank testified that "insurance was on the top of my mind during those days," he stated, "I never asked for a reference or policy or contract. I must say, if I was wrong to do so, I stand corrected." Tran. Feb. 9, 1994 at 65. In response, this Court finds that Frank failed to diligently question the nature of the cancellation or ask for a reference to the policy. Had he done so, as the facts of this case reveal, he would have found, as does this Court, that the policy was cancelled based on the at-will termination provision of "Section H." Thus, Frank himself created his erroneous presumption that the insurance policy, vital to the very existence of the Debtors, was cancelled solely because of nonpayment of premiums. Such presumption, combined with his failure to research the situation properly, indicates that he should have been aware of "Section H," the unilateral cancellation clause, prior to the renewal of the policy in December of 1993.

Pursuant to Federal Rule of Bankruptcy Procedure 7052, the foregoing constitutes the Court's findings of fact.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O).

2. The preliminary injunctions enjoining WQIS from cancelling the Debtors' pollution liability insurance are terminated, and the Debtors' motions are hereby DENIED.

SETTLE AN ORDER CONSISTENT WITH THIS OPINION.

---

29. The Debtors do not deny that failure to pay premiums was a valid reason for termination.